UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

STATE OF NEW YORK and ALEXANDER B. GRANNIS,
as Commissioner of the New York State Department of
Environmental Conservation,

                             Plaintiffs

                    -against-

NEXT MILLENIUM REALTY, LLC, et al.,

                            Defendants,
-------------------------------------------------------------------------------X
NEXT MILLENIUM REALTY, LLC, 101 FROST STREET
CORPORATION, EMILY SPIEGEL, individually and as trustee
under an agreement of trust for the benefit of Pamela Spiegel and
Lisa Spiegel, JERRY SPIEGEL,

                        Third-Party Plaintiffs,

                    -against-

ADCHEM CORP., et al.,

                        Third-Party Defendants.
-------------------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 06-1133 (SJF) (MLO)

**ORENSTEIN, Magistrate Judge:**

      Plaintiffs State of New York and Alexander B. Grannis, as Commissioner of the New

York State Department of Environmental Conservation (collectively "Plaintiffs") brought this

action under the Comprehensive Environmental Response, Compensation and Liability Act of

1980, as amended by the Superfund Amendments and Reauthorization Act of 1980, as amended

by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*,

("CERCLA") and New York's common law of public nuisance, indemnification and restitution

seeking to recover past and future response costs incurred by the State in responding to the

alleged release and threatened release of hazardous substances at or from thirteen facilities that

form the New Cassel Industrial Area Superfund Site, located in North Hempstead, New York

(the "NCIA Site") and to redress harm to the public health and environment of the State resulting

from defendants' alleged acts and omissions at the NCIA Site. (Second Amended Compl. ¶¶ 1,

139-168.)

Pursuant to the Orders of District Judge Sandra J. Feuerstein dated October 5, 2009,

December 15, 2009, June 17, 2010 and July 2, 2010, defendants' (1) Next Millennium Realty,

LLC ("Next Millennium"), 101 Frost Street Associates, L.P., 101 Frost Street Corporation, Alan

Eidler, as Co-Executor of the Estate of Emily Spiegel, Pamela Spiegel Sanders, as Co-Executor

of the Estate of Emily Spiegel, Lise Spiegel Wilks, as Co-Executor of the Estate of Emily

Spiegel, and Jerry Spiegel (collectively the "Frost Street Defendants"); (2) Grand Machinery

Exchange, Inc., Paul Merandi[1] and 2632 Realty Development Corporation (collectively the

"Grand Machinery Defendants")[2]; (3) Barouh Eaton Allen Corporation ("BEAC")[3]; (4) Sulzer

_____

[1]In their Memorandum of Law in Opposition to the Grand Machinery Defendants' Motion
for Summary Judgment, Plaintiffs state that they submitted their opposition only as to defendants
Grand Machinery Exchange Inc. and 2632 Realty Development Corporation, and that they intend to
withdraw the claims against defendant Paul Merandi. (Pls.' Mem. of Law in Opp. to Grand
Machinery's Motion for Summary Judgment, dated Jan. 15, 2010, at 2 n.1.) Accordingly, the Court
respectfully reports and recommends that defendant Paul Merandi's motion for summary judgment
be granted.

[2]By Notice of Motion dated December 14, 2009, the Grand Machinery Defendants joined in
the Frost Street Defendants' motion for summary judgment. *Notice of Motion*, dated December 14,
2009.

[3]By letter dated June 11, 2010, defendant BEAC joined in the Frost Street Defendants'
and Grand Machinery Defendants' motions for summary judgment. *Smith Letter*, dated June 11,
2010.

Metco ("Sulzer")[4]; (5) Utility Manufacturing Corporation, Nest Equities, Inc., Audie Kranz and

Wilbur Kranz (collectively the "Utility Manufacturing Defendants")[5]; and Tishcon Corporation,

Kamal Chopra and Joe Elbaz (collectively the "Tishcon Defendants")[6] motions for summary

judgment pursuant to Fed. R. Civ. P. 56 have been referred to the undersigned. In addition,

defendants NMB (USA) Inc. and IMC Eastern Corporation (collectively the "IMC

Defendants")[7]; Island Transportation Inc.[8]; William Gross and C&O Realty (collectively the

"C&O Defendants")[9]; and Atlas Graphics, Inc., Richard Degenhart and H.D.P. Printing

Industries, Inc. (collectively the "Atlas Graphics Defendants")[10] (hereinafter all moving parties

---

[4]By letter dated June 10, 2010 (and filed June 14, 2010), defendant Sulzer joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *O'leary Letter*, dated June 10, 2010.

[5]By Notice of Motion dated June 15, 2010, the Utility Manufacturing Defendants joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Notice of Motion*, dated June 15, 2010.

[6]By letter dated June 29, 2010, the Tishcon Defendants joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Landrigan Letter*, dated June 29, 2010.

[7]By letter dated June 9, 2010, the IMC Defendants joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Lucic Letter*, dated July 9, 2010.

[8]By letter dated June 10, 2010, defendant Island Transportation, Inc. joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Woolson Letter*, dated June 10, 2010.

[9]By letter dated June 15, 2010, the C&O Defendants joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Schulz Letter*, dated June 15, 2010.

[10]By letter dated June 28, 2010, the Atlas Graphics Defendants joined in the Frost Street Defendants' and Grand Machinery Defendants' motions for summary judgment. *Robinson Letter*, dated June 28, 2010 (filed June 29, 2010).

referred to collectively as "Defendants").[11]

For the reasons that follow, this Court respectfully reports and recommends that Defendants' motions for summary judgment be granted.

## BACKGROUND

The factual background underlying this action is set forth in this Court's prior Reports and Recommendations, dated February 17, 2007 and May 2, 2008, familiarity with which is presumed. *See Report and Recommendations,* dated February 17, 2007 and May 2, 2008, Orenstein, M., M.J.[12] The Court provides only those facts deemed pertinent to this motion.

The following facts are undisputed unless otherwise noted:

The NCIA is comprised of approximately 170 acres of industrial and commercial property, which is bounded by the Long Island Railroad, Frost Street, Old Country Road and Grand Boulevard in North Hempstead, Nassau County, New York. (Second Am. Compl.¶¶ 2, 52-53, 140-42; Pl. 56.1 Statement at ¶¶ 2, 79.) The thirteen manufacturing and commercial facilities that are the subject of this action are a portion of the NCIA complex. (*Id.*) The NCIA is located over a sole-source aquifer identified by the United States Environmental Protection

---

[11]The Court notes that defendants Arkwin Industries, Inc., Thomas Molloy, William Maglio, as co-executor of the Estate of Daniel Berlin, and Frank Jacobson, as co-executor of the Estate of Daniel Berlin (collectively the "Arkwin Defendants") have filed a motion for summary judgment and have agreed to a separate briefing schedule with Plaintiffs. *See Ommen Letter*, dated September 9, 2010 (informing the Court that the Arkwin Defendants agreed to the following briefing schedule: State's opposition papers shall be served by October 8, 2010 and the Arkwin Defendants' reply papers shall be served by October 25, 2010). Accordingly, the Arkwin Defendants' motion for summary judgment will not be considered.

[12]By Orders, dated August 14, 2007 and May 2, 2008, respectively, the district court adopted the Reports and Recommendations in their entirety as Orders of the Court. *State of New York v. Next Millennium Realty, LLC,* 2007 WL 23621444 (E.D.N.Y. Aug. 14, 2007; *State of New York v. Next Millennium Realty, LLC,* 2008 WL 1958002 (E.D.N.Y. May 2, 2008.

Agency (the "EPA"). (*Id.*) Groundwater underlies the Sites at a depth of approximately 60 feet, and two public water supply wells are located approximately 1,500 feet downgradient of the NCIA. (*Id.*)

According to the Second Amended Complaint, the disposal of hazardous substances at each of the thirteen facilities have contaminated the soil and groundwater at and in the vicinity of each facility, including in and around the Bowling Green Water District ("Bowling Green") public water supply wells. (*Id.*) As the contaminants from each of the facilities commingled, Plaintiffs allege that they formed a plume[13] of pollutants that has migrated from the NCIA sites and has contaminated the nearby Bowling Green public water supply wells, thus threatening the environment and public health. (*Id.*) Defendants are alleged to be the current owners and/or operators of the facilities and/or the successors to the entities that owned or operated the thirteen NCIA Sites at the time of the disposal of hazardous substances. (*Id.*)

Development of the NCIA dates back to early 1950, and past industrial activities conducted within the NCIA have resulted in extensive contamination of groundwater at the NCIA by volatile organic compounds ("VOC"s). (Second Am. Compl.¶¶ 54-56; Pl. 56.1 Statement at ¶¶ 79-81.) Based upon an investigation by the Nassau County Health Department in connection with the NCIA site which revealed the presence of VOCs in the groundwater, the New York State Department of Environmental Conservation (the "NYSDEC") placed the entire NCIA properties on the New York State Registry of Inactive Hazardous Waste Disposal Sites (the "Registry") in August 1988. (*Id.*) The NYSDEC retained Lawler, Matusky & Skelly

---

[13] A plume is a volume of contaminated groundwater in an aquifer that extends downward and outward from a specific source of contamination. (Pls.' Mem. of Law in Opp. to Defs. Grand Machinery's Mot. for Summary Judgement, dated Jan. 15., 2010 at 3.)

("LMS") to conduct Preliminary Site Assessments ("PSA"s) to locate sources of groundwater contamination and to identify potentially responsible parties. (*Id.*) In March 1995, the NYSDEC delisted the NCIA Site as a whole and listed seven properties within the NCIA as Class 2 sites.[14] In 1996, 1997 and 1998 additional PSAs resulted in the NYSDEC listing additional properties within the NCIA as Class 2 sites. (*Id.*)

In remediating Class 2 sites in the NCIA, the NYSDEC employed a three-prong strategy. (Second Am. Compl.¶¶ 57; Pl. 56.1 Statement at ¶¶ 82, 137-38.) First, the NYSDEC identified on-site source areas of contamination and chose appropriate remedial actions to address these areas. (*Id.*) Second, the NYSDEC investigated the on-site groundwater contamination at each site and chose appropriate remedial actions to address these areas. (*Id.*) Finally, the NYSDEC investigated off-site groundwater contamination migrating from Class 2 sites in the NCIA toward the Bowling Green public water supply. (*Id.*)

The NYSDEC conducted an area wide Remedial Investigation/Feasibility Study ("RI/FS") relating to off-site groundwater contamination that was migrating from the Class 2 sites in the NCIA. (*Id.*) The NYSDEC in 2003 issued its Record of Decision ("ROD") for the NCIA Site's off-site groundwater remediating south of the NCIA Site, called Operable Unit No. 3 ("OU-3"). (*Id.*) In its decision, the NYSDEC required the full plume remediating of the Western, Central and Eastern plumes, in the upper and lower portions of the aquifer with in-well stripping treatment systems. (*Id.*) In November 2005, the NYSDEC issued an Explanation of Significant Differences that separated the sites involved into two distinct groups: those located in the areas of the origin of the Eastern and Central plumes, and those located in the area of the

---

[14]Class 2 sites listed on the Registry are those properties that contain hazardous wastes and pose a significant threat to the environment. (*Id.*); *see* NYCRR § 375-1.8(a)(2)(ii).

origin of the Western plum. (*Id.*)

On March 13, 2006, Plaintiffs commenced the instant action[15] in the United States

District Court for the Eastern District of New York (Feuerstein, *D.J.*) against Defendants (1)

seeking recovery costs under § 107 of CERCLA for the completion of the remediating of the off-

site groundwater plumes including the costs of investigating and remediating the off-site

groundwater contamination in and around the Bowling Green public water supply wells and of

responding to releases of hazardous substances at the respective facilities; (2) injunctive relief to

abate the contamination in the NCIA and for reimbursement of the State's costs in abating a

public nuisance under New York common law; (3) restitution; and (4) indemnification. (Compl.,

dated Mar. 13, 2006.)  Plaintiffs amended the Complaint to add certain NCIA parties to this

action on May 12, 2006.  (Am. Compl., dated May 20, 2006.)  On May 20, 2008, Plaintiffs filed

a Second Amended Complaint to add certain NCIA parties to this action.  (Second Am. Compl.,

dated May 20, 2008.)

Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56 on the

grounds that Plaintiffs' claims are time-barred.

The underlying facts and applicable law surrounding Defendants' motion will be

---

[15] *State of New York et al. v. Next Millenium Realty, LLC et al.,* CV 06-1133 (SJF)(MLO) was consolidated into lead case, *Next Millenium Realty, LLC et al. v. Adchem Corp. et al.,* CV 03-5985 on May 4, 2006 as related actions.  *See Order*, dated May 4, 2006 (Feuerstein, *D.J.*).  Case number CV 06-1133 was administratively closed by *Order*, dated May 4, 2006.  *Id.*  Thereafter, in an Order dated September 8, 2010, the two actions were severed for all purposes, and the Clerk of the Court was directed to reopen the case entitled *State of New York et al. v. Next Millenium Realty, LLC et al.,* under docket number CV 06-1133.  *See Order*, dated September 8, 2010 (Feuerstein*, D.J.*).  By notice of motion dated September 17, 2010, defendants Adchem Corp., Northern State Realty Co., Pufahl Realty Corp. and Lincoln Processing moved for reconsideration of the Order, dated September 8, 2010 which severed the two actions for all purposes.  (Notice of Motion, dated September 17, 2010.)

presented in the relevant discussion section below.

## DISCUSSION

### I.        *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56( c)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Globecom Group, LLC  v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Murphy*, 2008 WL 2433615, at *6.  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S. Ct. 2548 (citing Fed. R. Civ. P. 56); *see Gilles v. Repicky*, 511 F.3d 239, 242 (2d Cir. 2007).  In doing so, "[e]vidence submitted in support of a summary judgment motion must be admissible [at trial], and the proponent of the evidence bears the burden of showing that the evidence is admissible." *Vahos v. General Motors Corp.*, 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008); *see Patterson v. County of Oneida*, 375 F.3d 206, 219-20, 222 (2d Cir. 2004).

In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Celotex,* 477 U.S. at 249, 106 S. Ct. at 2511; *see Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2006). In doing so, "[t]he district court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.,* 73 F.3d 13, 15 (2d Cir. 1995) (citation omitted); *see Augustin v. Yale Club of New York City*, 2008 WL 1813229, at *1 (2d Cir. 2008).

## II.    *CERCLA Claims*

CERCLA is a broad remedial statute that Congress enacted to encourage the timely cleanup of sites contaminated with hazardous wastes and other pollutants. *W.R. Grace & Co. v. Zotos Int'l, Inc.*, 559 F.3d 85 (2d Cir. 2009); *see Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) ("CERCLA, remedial in nature, is designed to encourage prompt and effective cleanup of hazardous waste sites"). CERCLA "grants the President . . . power to command government agencies and private parties to clean up hazardous waste sites," *Key Tronic Corp. v. Untied States,* 511 U.S. 809, 814 (1994), and provides that "everyone who is responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup," *United States v. Bestfoods*, 524 U.S. 51, 56 & n.1 (1998) (internal quotation marks and citations omitted). *See Niagara Mohawk Power Corp.*, 596 F.3d at 120 ("CERCLA empowers the federal government and the states to initiate comprehensive cleanups, and to seek recovery of expenses associated with those cleanups"); *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000) (CERCLA sets forth "a regime of broad-ranging liability, permitting the government to recover its remediating expenses directly from parties responsible

for pollution and authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats") (citations omitted); *see also* S. Rep. No. 848, 96[th] Cong., 2d Sess. 13 (1980) (CERCLA's expansive liability scheme is intended "to assure that the costs of injuries resulting from defective or hazardous substances are borne by the persons who create such risks rather than by the injured parties who are powerless to protect themselves").

CERCLA's goals include "encouraging the timely cleanup on those responsible for creating or maintaining the hazardous conditions." *Consol. Edison Co. of N.Y. v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005) (internal quotation marks and citation omitted); *accord Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1874 (2009). In support of these goals, CERCLA provides two distinct legal remedies for the recoupment or reimbursement for hazardous waste cleanup and prevention costs at contaminated sites: (1) cost recovery actions by the government and private parties against potentially responsible parties under § 107(a) and (2) contribution actions under § 113(f). 42 U.S.C. §§ 9607(a) and 9613(f); *see Cooper Indus. Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 163 & n. 3 (2004); *Schaefer v. Town of Victor*, 457 F.3d 188, 194 (2d Cir. 2006). Only § 107(a) is at issue in the instant matter.

### (a)    *Statute of Limitations Under CERCLA § 107*

"Section 107 authorizes the United States, a state, or any other person to seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property, provided that those actions are consistent with the National Contingency Plan – the federal government's roadmap for responding to the release of hazardous substances." *Niagara Mohawk Power Corp.*, 596 F.3d at 120-21 (internal quotation marks and citation omitted). Under §107 of CERCLA, there are two applicable limitations periods governing cost recovery actions

depending on whether the response costs were incurred in connection with a removal action or a remedial action. 42 U.S.C. § 9613(g)(2); *see Schaefer*, 457 F.3d at 195 ("For cost recovery actions under § 107, CERCLA distinguishes between two kinds of response: remedial actions – generally long-term or permanent containment or disposal programs – and removal efforts – typically short-term cleanup arrangements") (internal quotation marks and citation omitted); *see also State of New York v. Shore Realty Corp.,* 759 F.2d 1032,1040 (2d Cir. 1985). Section 113(g)(2) of CERCLA provides in pertinent part:

> An initial action for recovery of the costs referred to in [§ 107] of this title must be commenced;
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under [§ 104(c)(1)(C)] of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(G)(2). "Because of this difference in limitations periods, whether an activity is a "removal action" or a "remedial action" under § 107(a) can be determinative of the timeliness of a claim." *Schaefer*, 457 F.3d at 195-96.

The statute defines removal actions as those responses that include

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public

11

health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Remedial actions are defined as those

actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24). "Distilled to its core, the key distinction between a remedial and a removal action is the purpose for which the action is undertaken. As a rule of thumb, though not an invariable guide, remedial actions are long-term or permanent containment or disposal programs, while removal actions are typically short-term cleanup arrangements." *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 616 F. Supp. 2d 228, 270 (D. Conn. 2009) (internal quotation marks and citations omitted).

### (b)    *Response Activities at the NCIA Site*

Defendants contend that (i) the physical on-site construction of the granulated activated carbon treatment system (the "GAC System") to address contamination found in the Bowling Green aquifer which commenced on or before December 10, 1990; and/or alternatively (ii) the supplemental construction of a Packed Tower Aeration System (the "supplemental air stripping tower") which was connected to the GAC System which commenced on June 12-13, 1995,

triggered the running of the time in which the State must have commenced its initial action for the recovery of costs associated with a remedial action under CERCLA.  According to Defendants because Plaintiffs failed to commence the within action within six years of construction of (i) the GAC System in December 1990 and/or (ii) the supplemental air stripping tower on June 12-13, 1995, Plaintiffs' cost recovery claims under § 107 of CERCLA are barred by the applicable statute of limitations.

Plaintiffs disagree and argue that the instant action was timely commenced because the construction of the GAC System and the supplemental air stripping tower constituted removal actions, not remedial actions.  In the alternative, Plaintiffs argue that the applicable statute of limitations was tolled by the execution of tolling agreements by Defendants.

### (i)  Construction of GAC System

A review of the record reveals the following.  The "NCIA was first recognized as an area with widespread groundwater contamination during a county-wide groundwater investigation conducted by the NCDH in 1986."  (ROD, dated October 2003, at 4.)   The primary concern to human health and/or the environment was the threat of contamination to the sole source aquifer that is the source of the water supply at the Bowling Green water supply wells.  (*Id*. at 1)  As a result of the investigation, the NYSDEC listed the NCIA as a Class 2 site in the Registry in 1988. (*Id*.)  In 1989, Bowling Green hired Dvirka & Bartilucci Consulting Engineers ("D&B") to recommend a "long-term treatment option" for remediating the VOC groundwater contamination migrating from the NCIA Site into the Bowling Green water supply wells.  (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 2-4; Ex. 1.)   Following its evaluation, D&B recommended the GAC System at an estimated project cost of $1.25 million.  (*Id*. at ¶ 6.)  On July 28, 1990, the NCDH approved the GAC System and the construction of the treatment system was put out to bid.  (*Id.* at ¶¶ 7-10.)

Although Plaintiffs argue that the State had no involvement with the design, construction or approval of the plans for the GAC System (or the supplemental air stripping tower), and therefore the recovery activity cannot be imputed to the State for purposes of calculating the CERCLA statute of limitations, Plaintiffs' argument is belied by the record and applicable law.

Section 5-1.22 of Part 5, Chapter 1 of the New York State Sanitary Code ("SSC"), provides that no supplier of water may construct or install an addition to or modification of an existing public water system until the plans and specifications have been submitted to and approved by the State. 10 N.Y.C.R.R.§ 5-1.22; *see Dunn Decl.*, dated Nov. 18, 2009, ¶ 2. Plans for the modification of an existing public water system may be approved by the State when the modification is deemed necessary to protect public health or safety. (*Id.*) A supplier of water must receive approval of the State[16] before placing into service any public system constructed under the requirements of the SSC. The New York State Department of Health ("NYSDOH") delegates to local health departments the responsibility for reviewing, commenting, and ultimately approving plans by the local water supplier for modifying the existing water supply system. (*Dunn Decl.*, dated Nov. 18, 2009, ¶¶ 3-4.)

Here, NYSDOH delegated direct supervision of the review, approval and construction of the GAC System (and supplemental air stripping tower) at Bowling Green to its designated representative NCDH. (*Id.*) Notwithstanding, in March 1990, D&B advised both NYSDOH and NCDH that the Bowling Green water supply wells had detected levels of contamination. (*Alarcon Decl.,* dated Mar. 17, 2009, ¶ 5.) NYSDOH received the initial application for the approval of the plans and was copied on all necessary correspondence concerning the GAC System and

---

[16]"State" is defined to mean the State Commissioner of Health or his designated representative. SSC § 5-1.1(bk).

supplemental air stripping tower.  (*Id.*; *see Doyle Letter,* dated March 12, 1990 (attached as Ex. A to Frost Street Defs. Reply Mem., dated April 5, 2010)); *Davis Aff.*, dated Mar. 27, 2009, ¶ 6; Exs. 2-5; *Alarcon Decl.,* dated Mar. 17, 2009, ¶ 5; Exs. A-C, D-E )   Indeed, by letter dated March 12, 1990, D&B's  plans for the construction of the GAC System were sent directly to Gilbert Faustel of the NYSDOH and sought the NYSDOH's assistance to expedite approval of the plans and specifications for the construction project.  (*Doyle Letter,* dated March 12, 1990.)  In pertinent part, the letter set forth the following:

> Transmitted herewith are three (3) copies of Contract Nos. 1, 2, 3, and 4 for the Construction of Bowling Green Estates Water Treatment Facility and Application for Approval of Plans for Public Water Supply Improvement Gen. Form 296.  The project involves the construction of a 4.0 MGD Granular Activated Carbon (GAC) Adsorption System to serve Well No. 1 and Well No. 2 in the Bowling Green Estates Water District, including the replacement of deep well turbine pumps and mortors.  The project was broken down into several contracts to expedite fabrication and delivery of treatment equipment.

> At present, the Town of Hempstead Department of Water is installing a Granular Activated Carbon (GAC) Adsorption System at the site of Wells No. 1 and 2 in order to maintain water of acceptable quality.  The quality of water discharged from each of the wells has shown an increase in the levels of organic compounds; however, the concentration of organic compounds is below the maximum allowable limit as set forth in the New York State Sanitary Code Part 5, the Town of Hempstead Department of Water has initiated the installation of a GAC Adsorption System to ensure and maintain water of acceptable quantity and quality.

> The treatment system is designed to remove, at a minimum, three times the actual influent concentration produced from any one well.

> The combined discharge from the two public water supply wells is approximately 2,800 gallons per minute (gpm).  The granular activated carbon adsorption system consisting of three (3) carbon adsorption units will treat the entire influent flow of 2,800 gallons per minute produced from the wells to reduce the levels of volatile organic compounds in the effluent . . . .

> The Town of Hempstead is proceeding with the construction phase of the project with the intent of the system being completed and approved for use prior to the onset of summer, in order to meet area peak day demands. . . . We would appreciate any assistance your office can provide to expedite approval of plans and specification.

(*Id.*)

On June 28, 1990, NCDH approved the plans for the installation of the GAC System, notably giving its approval on NYSDOH Form DOH 101 which stated that the approval was "issued for the State Commissioner of Health." (*Alarcon Decl.,* dated Mar. 17, 2009, ¶ 12, Ex. E.) Thereafter, the Town was permitted to operate the system when the NCDH issued an Approval of Completed Works certificate based upon the satisfactory water analysis results from the GAC System, and notably NCDH gave its approval on NYSDOH Form GEN219 which stated that the approval was "issued for the State Commissioner of Health." (*Id.*, Ex. F.)

The fact that the NYSDOH delegated direct supervision of the installation of the GAC System to the NCDH does not relieve the State of its statutory responsibility for the approval of the treatment system. *See, e.g., Long Island Head Start Child Dev. Servs. v. Economic Opp. Comm'n of Nassau Cty.,* 558 F. Supp. 2d 378, 396 (E.D.N.Y. 2008) (holding "in general, under the law of agency, an agent's knowledge is imputed to the principal, when the knowledge is material to the subject matter of his agency"). Moreover, there is sufficient evidence in the record that the State had involvement with the approval of the GAC System, including the facts that the NYSDOH received the initial application for the approval of the plans, was copied on all correspondence concerning the GAC System, and that the approval of the plans for the GAC System as well as the approval of a completed works certificate were officially noticed on NYSDOH letterhead and official forms under the authority of the State Commissioner of Health. (*Alarcon Decl.*, dated Mar. 17, 2009, ¶ 12, Ex. E.) Based on this evidence, the Court finds that

Plaintiffs had involvement with and approval of the construction of the GAC System at the NCIA Site.

On December 10, 1990, the construction of the GAC System was completed and D&B sought permission from NCDH to operate the GAC System at Bowling Green. (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 11-12; Ex. 1, 4, 8.) Between 1990 and the spring of 1995, the GAC System was the exclusive remedy in place to treat the groundwater contamination adversely affecting the Bowling Green public waters supply.

Notably, in March 1995, the NYSDEC delisted the NCIA Site as a whole and listed seven properties within the NCIA as Class 2 sites. Additional PSAs thereafter resulted in the NYSDEC listing additional properties within the NCIA as Class 2 sites. The GAC System remains in use to this date, nearly nineteen years after its construction.[17] (*Davis Aff.*, dated Mar. 27, 2009, ¶ 14; *see Merklin Aff.*, dated Mar. 9, 2009, ¶¶ 10-11.)

### (ii)     Construction of the Supplemental Air Stripping Tower

A review of the record indicates the following. In the spring of 1995, the NCDH issued a report indicating that higher concentrations of contamination originating from the NCIA were migrating toward Bowling Green. (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 15-18; Exs. 9-10.) On May 16, 1995, the NYSDEC and NYSDOH conducted a public meeting concerning the groundwater contamination, which was attended by Commissioner of the Town of Hempstead Water District Daniel Davis and the Town of Hempstead Town Attorney. (*Id.*) At the meeting, Commissioner Davis requested that the State reimburse Bowling Green for all costs associated

---

[17] The GAC System is presently utilized in conjunction with the supplemental air stripping tower which was constructed in 1995, and is to be incorporated into any future remedial systems at OF-3. (*Davis Aff.*, dated Mar. 27, 2009, ¶ 14; *Merklin Aff.*, dated Mar. 9, 2009, ¶¶ 4-6, 10-11; and ROD at 1, 19-22.)

with the construction and operation of the GAC System, and he received assurance that (i) "recovery of the cost of the construction and operation of the GAC treatment system would be pursued against the parties responsible for the contamination at [the] NCIA," and (ii) "that the NYSDEC would assist in the funding of necessary supplemental remedial systems to protect the quality of the Bowling Green water." (*Id.* at ¶¶ 16-20.)  Following the meeting, Commissioner Davis again hired D&B to identify further remedial options, and on May 23, 1995, D&B recommended an approximately 34' air stripping tower to supplement the GAC System.  (*Id.* at ¶¶ 21-27.)

On June 12 and 13, 1995, construction of the air stripping tower commenced.  (*Id.* at ¶¶ 28-32; Ex. 17; *Merklin Aff.,* dated Mar. 9, 2009, at ¶¶ 6-9.)  D&B hired Warren George, Inc. ("WGI") to drill three foundation borings[18] at Bowling Green that measured four inches in diameter and went down 32 feet below the ground surface.  (*Id.*)  These soil borings were drilled with a large drilling truck (similar to the type of equipment used to drill a household well) and were drilled below the area onto which the concrete slab for the air stripping tower was to be poured.  (*Id.*)  Construction of the supplemental air stripping tower continued into July 1995, with the construction of the concrete pad on the which the air stripping tower would be erected as well as mechanical, electric and site work on the air stripping tower.  (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 33-34, 42-44, Ex. 22.)  The supplemental air stripping tower continues to be utilized to this day in conjunction with the GAC System.  (*Merklin Aff.*, dated Mar. 9, 2009, ¶ 11.)

### (iii)    Costs of Construction

The November 1989 process evaluation by D&B estimated that the project cost for the

_____

[18]The foundation borings were necessary and required physical on-site construction in order to support the air stripping tower (which weighed several tons).  (*Id.*)

GAC System was $1.25 million.  (*Davis Aff.*, dated Mar. 27, 2009, Ex. 1.)

By letter dated June 21, 1995, NYSDEC Director Michael J. O'Toole informed NCDH that the capital costs of the proposed supplemental water treatment system would be paid out of the State Superfund Program. (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 34-36, Ex. 18.)  The following week, the NYSDEC Project Engineer for the Remediating of the NCIA, Jeff Trad, telephoned NCDH requesting certain information regarding the NCDH's activities for site remediating at the NCIA, directed that NCDH keep track of all expenses associated with the installation of the air stripping tower, informed him that the expenses would be refundable by the State (not the federal government), and stated "that their approach to a payout for this expense is that this is part of the remediating to clean up the groundwater which is basically the use of treatment at the well head." (*Id.* at ¶¶ 35-36, Ex. 19.)

By letter dated March 23, 1998, NCDH requested from the NYSDEC reimbursement for the cost of construction of the supplemental air stripping tower from the New York State Superfund, for an estimate cost of $1.22 million, which included costs relating to integrating plant piping, instrumentation and safety controls with the existing granular activated carbon filters at the site.. (*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 42-44, Ex. 22.)   NCDH was subsequently reimbursed for all its costs, including the cost of the WGI foundation borings from the New York State Superfund as part of the capital cost of installing the air stripping tower.  (*Id.*)

 Significantly, in the instant CERCLA action, Plaintiffs are seeking to recover past and future response costs incurred in responding to the off-site groundwater contamination in the area bordering the NCIA south of Old Country Road and Grand Boulevard, including in and around the Bowling Green public water supply wells.  (Second Amended Complaint, dated May 20,

2008.)  In particular, the record indicates that Plaintiffs are seeking the recovery of NYSDOH

oversight costs incurred in 1990 and in 1995-96 in connection with activities at NCIA, including

oversight of the approval of the GAC System and air stripping tower, and all construction costs of

the supplemental air stripping tower system.  (*Maldonado Aff.* dated Aug. 21, 2009, Ex. 7,

Attachment B, Exs.4, 23.)

### (iv)     *Classification of the Response Activities at the NCIA Site*

Given the facts surrounding the history of the construction, use and projected use of the

response activities at the NCIA site set forth in the record evidence and the applicable legal

principles, this Court concludes that the GAC System utilized in conjunction with the

supplemental air stripping tower were part of a permanent containment effort that was intended

"to prevent and minimize the release of hazardous substances so that they do not migrate to cause

substantial danger to present or future public health or welfare or the environment," CERCLA §

101 (24), particularly with respect to groundwater contamination adversely affecting the Bowling

Green public waters supply, *see Second Amended Compl.*, dated May 20, 2008.

First, the manner in which the project was planned, designed and implemented suggests

that the response was intended to be a remedial action.  Based on a groundwater investigation

conducted by NCDH in 1986 that revealed a significant threat to public health and the

environment posed by contamination found at and being released from the NCIA, the NYSDEC

listed the entire NCIA as a Class 2 site in the Registry in 1988.  Bowling Green thereafter hired

D&B to recommend a long-term treatment option for remediating groundwater contamination

migrating from the NCIA into the Bowling Green public drinking water supply well, and in 1989

D&B recommended the GAC System.  The GAC System was completed in December 1990.

Since the discovery of groundwater contamination in 1986, the only remedial response at OU-3

has been the installation of the GAC System as supplemented by the air stripping tower, and notably the GAC System in conjunction with the air stripping tower has been utilized at Bowling Green for nearly nineteen years.

Moreover, the response action was undertaken as part of a long-term strategy for the remediating of the groundwater contamination. The construction of the GAC System in 1990 at the Bowling Green water supply well was approved by both the NCDH and the NYSDEC and was constructed to permanently address, prevent and/or minimize the release of hazardous substances and remains in use to date as part of the remedial system for the NCIA. The construction of the supplemental air stripping tower which commenced on June 12-13, 1995 was added to the GAC System to address the higher concentrations of groundwater contamination originating from NCIA that were migrating toward Bowling Green and continues in conjunction with the GAC System to be in use to date.

Further, in its documents, the State's reference to the GAC System in combination with the supplemental air stripping tower as "remedial," while not dispositive, is significant. The ROD for OU-3, identifies the primary threat at the NCIA as the site's contravention of groundwater standards in the sole source aquifer that is the source of water supply at Bowling Green. (*Maldonado Decl.*, dated Aug. 21, 2009, Ex. 8, at 1.) Section 5.2 of the ROD refers to the GAC System and air stripping tower as an interim remedial measure and notes that the "supplemental water treatment system uses an air stripper to remove the contaminants, followed by carbon polishing" and was constructed using State Superfund money to ensure the protection of the public water supply. (*Id.* at 19.) In addition, Section 7.1 specifically lists the "supplemental treatment system consisting of air stripping followed by carbon polishing" as a

required "element of remediating" for "all remedial alternatives" considered in the ROD for OU-3 and notes that the air stripper followed by carbon polishing "was constructed to mitigate the impact of the groundwater contamination leaving the NCIA sites on the Bowling Green Water District supply wells." (*Id.* at 21-22.) Thus, pursuant to the ROD, the GAC System in combination with the air stripping tower is expected to be part of the long term remedial response into the future and will be incorporated into any final remedial system. Moreover, in response to an interrogatory, the State stated in pertinent part ". . . it is necessary to supplement the existing air stripper system currently in use at the Town of Hempstead Bowling Green with additional remedial measures in order to complete the remediating of Hazardous Substances present or expected to be present in the groundwater at the Bowling Green well field." (*Id.,* Ex. 7, at 22.) Finally, in a memorandum memorializing a conversation between the Commissioner of NCDH and the NYSDEC project engineer for the remediating of the New Cassel Industrial Waste Site on June 28, 1995, the Commissioner recorded as follows:

> J. Trad indicated that the [Bowling Green Water] Department should keep track of all of the expenses associated with the installation of the air stripping tower at the Iris Place Pump Station [Bowling Green] and at the completion of the project the Department could then advise his office as to the total cost of the stripper.
>
> This expense he indicated would be a refundable expense by the State (not the Federal Government) and that their approach to payout for this expense is that it is part of the remediating to clean up the groundwater which is basically the use of treatment at the well head.

(*Davis Aff.*, dated Mar. 27, 2009, ¶¶ 35-36, Ex. 19.)

Finally, the estimate costs expended for the GAC System ($1.25 million) and for the supplemental air stripping tower ($1.22 million) suggests that the response activities were

undertaken as the initial phases of remediation at the NCIA as opposed to a short-term clean-up arrangement.

***(v)***      ***Timeliness of this Cost Recovery Action if Dated from the Construction of the GAC System***

Having concluded that the response activities (the GAC System utilized in conjunction with the supplemental air stripping tower) were remedial because they were part of long-term permanent containment effort and were intended to "prevent or minimize the release of hazardous substances," CERCLA § 101(24), the applicable statute of limitations for this cost recovery action is "6 years after initiation of physical on-site construction of the remedial action," CERCLA § 113(g)(2)(B). Thus, the determinative issue concerning the timeliness of Plaintiffs' action is whether any of the response activities were initiated prior to (i) Mar. 13, 2000 (six years before Plaintiffs initiated the recovery action against the Frost Street Defendants when Plaintiffs filed their Complaint, dated Mar. 13, 2006); (ii) May 12, 2000 (six years before Plaintiffs initiated the recovery action against defendants Grand Machinery and Paul Merandi, the Utility Manufacturing Defendants, the Tishcon Defendants, and the C&O Defendants when Plaintiffs filed their Amended Complaint, dated May 12, 2006); or (iii) May 20, 2002 (six years before Plaintiffs initiated the recovery against defendants 2632 Realty Development Corporation, BEAC, Island Transportation Inc., and the Atlas Graphics Defendants when Plaintiffs filed their Second Amended Complaint, dated May 20, 2006), constitute the "initiation of physical on-site construction of the remedial action." 42 U.S.C. §113(g)(2)(B); *see Schaefer*, 457 F.3d at 203-04 (examining, for purposes of determining when the statute of limitations begins to run on remedial actions, whether the activity was a [1] "physical activity," [2] that "occurred on site," [3] which "qualifies as construction," and thus [4] "qualifies as the initiation of remedial action").

23

Here, the initiation of the remedial action began with the physical on-site construction of the GAC System. The GAC System project involved the construction of a 4.0 MGD Granular Activated Carbon (GAC) Adsorption System to serve Well No. 1 and Well No. 2 in the Bowling Green Estates Water District, including the replacement of deep well turbine pumps and mortors, and the project was broken down into several contracts, including general construction, electrical, plumbing and ventilation, to facilitate the fabrication and delivery of treatment equipment. The physical on-site construction of the GAC System at the Bowling Green water supply well commenced in 1990 and was completed by December 10, 1990.[19] Given the initiation of the physical, on-site construction of the GAC System occurred prior to Mar. 13, 2000, May 12, 2000, and/or May 20, 2002, Plaintiffs' recovery action is untimely. Accordingly, this Court respectfully reports and recommends that Defendants motion for summary judgment be granted on this basis.

### (vi)    Timeliness of this Cost Recovery Action if Dated from the Addition of the Air Stripping Tower

In the alternative, should the District Court determine that the physical, on-site construction of the GAC System did not trigger the statute of limitations under CERCLA, then the Court respectfully reports and recommends that the supplementation of the GAC System, which began with the commencement of the construction of the air stripping tower that was connected to the GAC tower on June 12-13, 1995, started the clock for statute of limitations purposes. In such an instance, this Court finds that the physical on-site activity of a large drilling rig, drilling 32 foot deep foundation borings into the ground below the site of the proposed concrete slab for the air

---

[19]Although the parties have not specified the date upon which the on-site construction of the GAC System at Bowling Green commenced, it is undisputed that it commenced sometime in 1990 and was completed on or before December 10, 1990. In any event, even using use the completion date, December 10, 1990, for statute of limitations purposes, as discussed *infra* Plaintiffs' CERCLA claims are time-barred.

stripping tower at the Bowling Green water supply well constitutes the initiation of the physical on-site activity related to the construction of the supplemental air stripping tower. *See, e.g., Schaefer*, 457 F.3d at 203 ("While the mere purchase of a crane does not constitute the initiation of physical on-site construction, Schaefer's subsequent use of the crane to spread cover (a mixture of topsoil, sand, and gravel) over his landfill satisfies each of the four statutory prerequisites"). In any event, given the initiation of the physical, on-site construction of the supplemental air stripping tower that was connected to the GAC System occurred prior to Mar 13, 2000, May 12, 2000 and/or May 20, 2002, Plaintiffs' recovery action would be untimely. Accordingly, on this alternative basis, this Court respectfully reports and recommends that Defendants motion for summary judgment be granted.

### *(vii)   The Tolling Agreements*

Although Plaintiffs argue that tolling agreements entered into by certain of the Defendants tolled the applicable statute of limitations period, as set forth below, Plaintiffs' CERCLA claims were already time-barred by the effective date of the each of the respective tolling agreements.[20]

The record indicates the following. Prior to commencing the instant action, Plaintiffs and certain of the Defendants entered into tolling agreements. Significantly, the tolling agreements preserved these defendants' rights to raise the statute of limitations defense to claims that were time-barred prior to the effective dates of the agreements and provided that they shall only apply prospectively and do not operate to revive any limitations periods. The tolling agreements entered

---

[20] As discussed *infra*, none of the tolling agreements entered between Plaintiffs and the respective above-listed defendants became effective prior to the expiration of the applicable statute of limitations, *i.e.*, either December 1996 (six years after on-site construction of the GAC System commenced), or in the alternative, June 12-13, 2001 (six years after on-site construction of the supplemental air stripping tower which connected to the GAC System).

into by these parties are as follows:

Plaintiffs and defendants Next Millenium and 101 Frost Street Associates entered into tolling agreements that were fully executed on July 9, 2001. As discussed above, the statute of limitations began to run (i) when on-site construction of the GAC System commenced (prior to December 10, 1990), or in the alternative, (ii) from the commencement of the construction of the supplemental air stripping tower which connected to the GAC System which commenced on June 12-13, 1995. Under either case, the tolling agreements did not become effective prior to the expiration of the applicable statute of limitations.

Defendant Grand Machinery and Paul Merandi (in his capacity as Treasurer of Grand Machinery) entered into tolling agreements with Plaintiffs in July 2001 with an effective date of June 28, 2001. (*Biblow Letter*, dated June 22, 2010.) As discussed above, the statute of limitations began to run (i) when on-site construction of the GAC System commenced (prior to December 10, 1990), or in the alternative, (ii) from the commencement of the construction of the supplemental air stripping tower which connected to the GAC System which commenced on June 12-13, 1995. Under either case, the tolling agreements did not become effective prior to the expiration of the applicable statute of limitations.

Defendants Utility Manufacturing Corporation, Nest Equities, Inc., Audie Kranz (in his capacity as President of Utility Manufacturing Corporation) and Wilbur Kranz (in his capacity as President of Nest Equities, Inc.) entered into tolling agreements with Plaintiffs on August 23, 2001. As discussed above, the statute of limitations began to run (i) when on-site construction of the GAC System commenced (prior to December 10, 1990), or in the alternative, (ii) from the commencement of the construction of the supplemental air stripping tower which connected to the

GAC System which commenced on June 12-13, 1995. Under either case, the tolling agreements did not become effective prior to the expiration of the applicable statute of limitations.

Defendants Tishcon Corporation entered into a tolling agreement with Plaintiffs on June 28, 2001. (*Landrigan Letter,* dated June 29, 2010.) As discussed above, the statute of limitations began to run (i) when on-site construction of the GAC System commenced (prior to December 10, 1990), or in the alternative, (ii) from the commencement of the construction of the supplemental air stripping tower which connected to the GAC System which commenced on June 12-13, 1995. Under either case, the tolling agreements did not become effective prior to the expiration of the applicable statute of limitations.

Accordingly, this Court respectfully reports and recommends that the Court find that the tolling agreements did not toll the relevant statute of limitations period.

### III.    New York State Law Claims

Plaintiffs' Second Amended Complaint also asserts claims under New York State law for public nuisance, restitution and indemnification. (Second Amended Compl., ¶¶ 149-68.) Having found that Plaintiffs' federal CERCLA claims do not survive Defendants' summary judgment motion, this Court concludes that subject to the District Court's reconsideration of the motion to sever case Nos. CV-03-5985 and CV-06-1122 (*Order*, dated September 8, 2010 (Feuerstein*, D.J.*; *see supra* fn. 15), it is unwarranted to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." *Maura v. Countrywide Home Loans, Inc.*, 2010 WL 2976506, at *10-11 (E.D.N.Y. July 22, 2010) (quoting

*Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986) (internal quotation marks omitted)); *see Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (holding that "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well) (internal quotation marks and citations omitted); *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction"); *see also Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998) (observing that principles of federalism and comity may counsel in favor of the dismissal of state law claims where "the federal claim on which the state claim hangs has been dismissed"); *see also Karmel v. Claiborne, Inc.*, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), given the absence of any federal claims that survive the motion for summary judgment and in the interest of judicial economy, convenience and comity, this Court respectfully reports and recommends (subject to the District Court's reconsideration of the motion to sever) that the District Court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismiss these claims without prejudice.

## CONCLUSION

For the foregoing reasons, the Court respectfully reports and recommends that Defendants' motion for summary judgment be granted in its entirety on the federal claims. In addition, the Court respectfully reports and recommends that the Court decline to retain jurisdiction over Plaintiffs' remaining state law claims and dismiss such claims without prejudice.

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within fourteen (14) days of receipt of this Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. 636 (b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992).


Dated:      Central Islip, New York
            September 24, 2010

                                _____/s/_____
                                MICHAEL L. ORENSTEIN
                                United States Magistrate Judge