UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
STATE OF NEW YORK and BASIL
SEGGOS[1], as ACTING COMMISSIONER OF
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,

                Plaintiffs,

      -against-

NEXT MILLENNIUM REALTY, LLC, et al.,

                Defendants.
--------------------------------------------------------X
FEUERSTEIN, J.

**FILED**
**CLERK**

2/9/2016 2:19 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**OPINION & ORDER**
**06-CV-1133 (SJF)(AYS)**

      Pending before the Court are, *inter alia*, (1) the motion of plaintiffs State of New York

and Basil Seggos, as Acting Commissioner of the NYDEC (collectively, "the State"), pursuant to

Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment on their claims

against defendants Next Millennium Realty LLC ("Next Millennium"); 101 Frost Street

Associates, L.P. ("101 FSA"); and Alan Eidler, Lise Spiegel Wilks and Pamela Spiegel Sanders,

as co-executors of the Last Will and Testament of Jerry Spiegel and duly authorized

administrators of the Estate of Jerry Spiegel (collectively, "the Spiegel Defendants") seeking

judgment declaring (a) that Next Millennium, 101 FSA and the Spiegel Defendants (collectively,

"the Frost Street Defendants") are jointly and severally liable under Section 107(a) of the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Basil Seggos, the
Acting Commissioner of the New York State Department of Environmental Conservation ("the
NYDEC"), is automatically substituted for Joseph Martens, the former Commissioner of the
NYDEC. The Clerk of the Court shall amend the caption of this action accordingly.

U.S.C. § 9607(a), for all response costs incurred and to be incurred by the State in responding to contamination at and emanating from the New Cassel Industrial Area ("NCIA") Site, and specifically into the off-site area designated as Operable Unit No. 3 by the NYDEC[2]; (b) that the State's response actions with respect to the NCIA are not inconsistent with the national contingency plan under Section 107 of CERCLA, 42 U.S.C. § 9607(a); (c) that the Frost Street Defendants are jointly and severally liable for further response costs incurred by the State in responding to contamination at and emanating from the NCIA Site under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2); and (d) that the Frost Street Defendants are liable for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such damages, pursuant to Sections 107(a) and 113(g) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g)(2), respectively ("the Natural Resource Damage Claim" or "the NRD Claim")[3]; and (2) the Frost Street Defendants' (a) cross motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on their fifth affirmative defense for divisibility of harm, and (b) motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial

---

[2] In 2010, the NYDEC referred OU-3, i.e., the two hundred eleven (211)-acre area of contamination down-gradient of the NCIA, to the United States Environmental Protection Agency ("EPA") for listing on the National Priorities List ("NPL"). In 2011, the EPA listed that area on the NPL as Operable Unit 1 of the New Cassel/Hicksville Ground Water Contamination Superfund Site, as a result of which the EPA assumed, and concomitantly relieved the State of, responsibility for remediating the groundwater contamination thereon. Since the site designated as OU-3 by the NYDEC is alternatively referred to in the record as OU-1 by the EPA, for the sake of clarity this opinion and order refers to the site as "State OU-3/EPA OU-1."

[3] The State did not move for summary judgment on any of its claims against defendants 101 Frost Street Corp. or Alan Eidler, Lise Spiegel Wilks, and Pamela Spiegel Sanders, as co-executors of the Last Will and Testament of Emily Spiegel and duly authorized administrators of the Estate of Emily Spiegel ("the Estate of Emily Spiegel"), who were substituted as defendants after the death of Emily Spiegel. (See, State's Memorandum of Law in Support of Its Motion for Partial Summary Judgment at 1, n. 1).

summary judgment dismissing the State's NRD Claim. For the reasons set forth below, the

State's motion is granted in part and denied in part and the Frost Street Defendants' cross motion

and motion are denied.

I.      Factual Background[4]

        The NCIA encompasses approximately one hundred seventy (170) acres of land in the

Town of North Hempstead in the County of Nassau; is comprised of numerous industrial

facilities; and is bounded by the Long Island Railroad to the north, Frost Street to the east, Old

Country Road to the south and Grand Boulevard to the southwest. (State's Statement of Material

Facts Pursuant to Local Rule 56.1 ["State 56.1"], ¶ 1; Frost Street Defendants' Counter-

Statement of Material Facts Pursuant to Local Rule 56.1 and Statement of Additional Undisputed

Facts ["FSD Counter."], ¶ 1). The NCIA was first recognized as an area with widespread

groundwater contamination during a county-wide groundwater investigation conducted by the

Nassau County Department of Health ("NCDH") in 1986. (FSD Counter., ¶ 3). Past industrial

activities conducted within the NCIA resulted in extensive volatile organic compound ("VOC")

contamination of groundwater in the vicinity of the NCIA Site. (Id., ¶ 2). Specifically, disposal

activities at industrial facilities within the NCIA resulted in the disposal of hazardous wastes,

including the VOCs tretrachloroethylene ("PCE"), trichloroethylene ("TCE") and 1,1,1-

trichloroethane ("1,1,1-TCA"), which are hazardous substances under CERCLA. (Id., ¶¶ 5, 8).

_____

        [4] The facts are taken from the parties' statements and counter-statements pursuant to
Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and
Eastern Districts of New York ("Local Civil Rule 56.1") and are undisputed, unless otherwise
indicated.

It is undisputed that releases of hazardous waste from facilities within the NCIA Site migrated from the facilities to surrounding areas, including State OU-3/EPA OU-1. (FSD Counter., ¶ 6). Although the State contends that the surrounding area also includes the Bowling Green Water District well field, (State 56.1, ¶ 6), the Frost Street Defendants "dispute[] that any hazardous waste originating from the Frost Street Sites or the eastern Plume have migrated into the Bowling Green Water District Well." (FSD Counter., ¶ 6).

In 1988, the NYDEC listed the NCIA as a Class 2 site in the Registry of Inactive Hazardous Waste Disposal Sites in New York, thereby indicating that hazardous waste was disposed at the site and constituted a significant threat to public health or the environment. (FSD Counter., ¶ 4). The NYDEC divided the NCIA Site into three (3) "operable units," (a) Operable Unit 1 ("OU-1"), which is the sources of contaminants at individual industrial facilities located within the NCIA, including the on-site soils at each of the Frost Street Sites; (b) Operable Unit 2 ("OU-2"), which is groundwater contamination at each such facility, including groundwater contamination between the Frost Street Sites; and (c) Operable Unit 3 ("State OU-3/EPA OU-1"), which is groundwater contamination downgradient from the NCIA Site, *i.e.*, south of Old Country Road and Grand Boulevard. (Id., ¶ 7). The NCIA and State OU-3/EPA OU-1 are directly above an EPA-designated sole source aquifer, which is the principal source of drinking water on Long Island. (Id., ¶ 10). Groundwater sampling in the NCIA and State OU-3/EPA OU-1 found concentrations of VOCs, including PCE, TCE and 1,1,1-TCA, in excess of state drinking water standards. (Id., ¶ 11).

In order to identify the sources of contamination within the NCIA, the NYDEC conducted Preliminary Site Assessments ("PSAs") within the NCIA. (FSD Counter., ¶ 12). As a result of

the PSAs, the NYDEC listed seventeen (17) facilities within the NCIA as Class 2 sites in the New York Registry of Inactive Hazardous Waste Disposal Sites ("the Registry") between May 1995 and September 1999. (Id., ¶ 13). Of the seventeen (17) Class 2 sites, three (3) were investigated and de-listed from the Registry; two (2) were investigated, remediated and de-listed from the Registry; and one (1) was investigated, remediated and re-classified as a Class 4 site. (Id., ¶ 14). The NYDEC designated the 89 Frost Street Site, 101 Frost Street Site and 770 Main Street Site (collectively, "the Frost Street Sites") as Class 2 sites in 1996. (Id., ¶ 15).

As a result of the release of hazardous substances at the NCIA Site, the NYDEC, using funds from the State's Inactive Hazardous Waste Remedial Fund, undertook investigation, remediation, and other actions to respond to the contamination in State OU-3/EPA OU-1. (FSD Counter., ¶ 16).

New York State regulations incorporate by reference the federal National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, at N.Y. Comp. Codes R. & Regs. tit. 6, § 375-1.1(g)(2). (FSD Counter., ¶ 17).

As of February 11, 2015, the NYDEC and the Department of Health ("DOH") have incurred four million nine hundred eighty-six thousand four hundred thirteen dollars and fifty-five cents ($4,986,413.55) in unreimbursed response costs related to State OU-3/EPA OU-1 and attributed to the thirteen (13) facilities at issue in this case.[5] (FSD Counter., ¶ 18).

---

[5] Pursuant to the various consent decrees entered in this case, the State will recover three million five hundred thirty-five thousand dollars ($3,535,000.00) of its past response costs from the settling parties. However, the issue of whether the Frost Street Defendants are entitled to a set-off of the settlement amounts pursuant to 42 U.S.C. § 9613(f)(2) depends upon, *inter alia*, whether the harm is divisible and capable of apportionment, or whether the Frost Street Defendants are jointly and severally liable, see United States v. Burlington N. R.R. Co., 200 F.3d 679, 695-98 (10th Cir. 1999), which, for the reasons set forth below, cannot be determined at this

A.    The 89 Frost Street Site

The 89 Frost Street Site is comprised of approximately three and a half (3.5) acres of land located at 89 Frost Street in North Hempstead.  (FSD Counter., ¶ 20).  Tenants and subtenants utilized a fifty-five thousand (55,000) square foot facility on the property for commercial manufacturing from approximately 1964, when it was built, through 1998, when the structures on the site were demolished.[6]  (Id., ¶ 21).

The environmental investigations carried out by the NYDEC and its consultants identified numerous hazardous substances present in the shallow soil, deep soil and groundwater at the 89 Frost Street Site.  (FSD Counter., ¶ 23).  Specifically, concentrations of PCE in on-site groundwater were as high as thirty-seven thousand micrograms per liter (37,000 µg/L), at a location downgradient of two (2) drywell/cesspools at the western part of the 89 Frost Street Site.  (Id., ¶ 32).  Later, during the NYDEC's Remedial Investigation, (1) PCE was detected in on-site groundwater at a concentration of one hundred twenty thousand micrograms per liter (120,000 µg/L), (id., ¶ 33); and (2) "PCE and TCE were detected at concentrations above guidance levels in soils at the 89 Frost Street Site," including PCE at forty-seven thousand micrograms per kilogram (47,000 µg/kg) in soil in a drywell, (id., ¶ 30).  During a subsequent investigation at the 89 Frost Street Site, PCE and TCE were detected in numerous soil samples, including PCE concentrations of forty-five million micrograms per kilogram (45,000,000 µg/kg) and TCE

_____

stage of the proceedings.

[6]  Although this fact is undisputed, third-party defendants Pufahl Realty Corp., Northern State Realty Corp., Northern State Realty Co., Adchem Corp. and Lincoln Processing Corp. (collectively, "third-party defendants") "[a]ffirmatively state that the original building at 89 Frost Street was destroyed by fire in 1976 and re-constructed in 1978."  (Third-Party Defendants' Counter-Statement of Material Facts pursuant to Local Rule 56.1 ["TPD Counter."], ¶ 21).

concentrations of four hundred thousand micrograms per kilogram (400,000 µg/kg).  (Id., ¶ 31).

Contamination in the on-site soil and groundwater indicates past disposal on the 89 Frost Street

Site.  (Id., ¶ 29).

The 89 Frost Street Site utilized an on-site sanitary system and numerous drywells until

February 1983, when it was connected to the municipal sewer system.  (FSD Counter., ¶ 22).  It

is undisputed that solvents were located in the old septic system utilized at the 89 Frost Street

Site.  (Id., ¶ 26).  The State contends that the old septic system "was taken out of service

following a fire that destroyed the building in or about 1976[;]" that a  new septic system was

installed at the property when the building was reconstructed on the site; and that "[t]he source

area investigation performed at the 89 Frost Street Site identified significant levels of

contamination in and downgradient from the location of the old septic system."  (State 56.1, ¶

27).  Although the Frost Street Defendants do not dispute those contentions, (FSD Counter., ¶

27), the third-party defendants do, claiming that "[t]here is no evidence that the septic system at

the 89 Frost Street Site was taken out of service or that a new septic system was installed

following the 1976 fire that destroyed the building."  (TPD Counter., ¶ 27).

Beginning in 1966, the 89 Frost Street Site was leased and subleased to various entities,

including, *inter alia*, Marvex Processing and Finishing Co. ("Marvex"), which conducted

manufacturing operations that utilized hazardous substances and disposed of chlorinated solvents

at the 89 Frost Street Site.[7]  (FSD Counter., ¶ 24).  Marvex, a subtenant, utilized solvents in its

_____

[7]  Although the State also identifies Adchem Corp. and Lincoln Processing Corp. as two
(2) other entities that leased the 89 Frost Street Site and conducted manufacturing operations that
utilized hazardous substances and disposed of chlorinated solvents at the site, (State 56.1, ¶ 24),
the third-party defendants dispute that contention on the grounds, *inter alia*, that there is no
evidence "that Adchem ever conducted manufacturing operations at the 89 Frost Street Site. . ."

manufacturing process and discharged the solvents into the 89 Frost Street Site on-site sanitary system. (Id., ¶ 25). Marvex released PCE at the 89 Frost Street Site both through its operation at the site of a dry cleaning machine that utilized PCE as a solvent, and as a result of the 1976 fire that destroyed Marvex's dry cleaning machine, a still containing solvents associated with the dry cleaning machine, a storage tank holding PCE and drums possibly stored at the site that may have contained PCE. (Id., ¶ 28).

B. The 101 Frost Street Site

The 101 Frost Street Site, also known as the Former Autoline Automotive Site, is comprised of approximately one and seven-tenths (1.7) acres of land in North Hempstead. (FSD Counter., ¶ 34). A thirty-five thousand (35,000) square foot facility located on the site was used by a number of tenants for commercial activities. (Id., ¶ 35). An on-site sanitary system was utilized at the 101 Frost Street Site until approximately February 1983, when the site was connected to the municipal sewer system. (Id., ¶ 36). There are approximately six (6) drywells on the 101 Frost Street Site. (Id., ¶ 37).

The State contends (a) that environmental investigations carried out by the NYDEC and its consultants in the 1990s identified numerous hazardous substances, including PCE and TCE, present in the shallow soil, deep soil and groundwater at the 101 Frost Street Site, (State 56.1, ¶¶ 38, 46); (b) that "[t]he OU-2 ROD [Record of Decision] for combined groundwater beneath the Frost Street Sites identifies numerous VOCs, including PCE, and TCE, in the groundwater under

_____

or "that Lincoln utilized hazardous substances of any kind at the 89 Frost Street Site. . . ." (TPD Counter., ¶ 24).

8

and adjacent to the 101 Frost Street Site[,]" (id., ¶ 47); (c) that "[c]ontamination in the on-site soil and on-site groundwater indicates past disposal on the Former Autoline Automotive Site/101 Frost Street Site[,]" (id., ¶ 53); and (d) that "the initial groundwater investigations conducted by [the NYDEC] in 1995 as part of the multisite [sic] PSA indicated groundwater contaminated with PCE at the [101 Frost Street Site], with concentrations of PCE as high as 20,000 µg/L on the western side of the site, which correlates with the suspected location of two dry wells/cesspools, and as high as 2,200 µg/L on the southern boundary of the site[.]" (id., ¶ 55). Although the Frost Street Defendants dispute those contentions on the basis that the source and origin of the contamination is unknown and that "[i]t is believed that the contamination on 101 Frost Street originated from the activities conducted on the 89 Frost Street Site[,]" (FSD Counter., ¶¶ 38, 46, 47, 53, 55), they do not support those assertions with any admissible evidence in the record. Although they cite to a report prepared by a purported expert, Lori Goetz, there is no such report in the record before this Court. Accordingly, the Frost Street Defendants' contentions are insufficient to raise a genuine issue of material fact for trial. In any event, it is undisputed that PCE and TCE were detected above guidance levels during the NYDEC's Remedial Investigation at the 101 Frost Street Site, with the highest PCE concentration at twenty-four thousand two hundred nine micrograms per kilogram (24,209 µg/kg), and the highest concentration of TCE at three thousand seven hundred seventy-five micrograms per kilogram (3775 µg/kg). (FSD Counter., ¶ 54).

The 101 Frost Street Site was occupied by (a) Bronco Model Aircraft and its affiliated company, Physio-Chem Corp., as tenants, between 1964 and 1972; (b) Nat Bassen Textiles, as a tenant, between in or about 1972 and 1982; and (c) Autoline Automotive Corp., US-1 Marketing

Group Inc. and Cobraline Manufacturing Corp. (collectively, "the Autoline tenants"), as tenants, between 1982 and 1990. (FSD Counter., ¶¶ 39-40, 45). According to the State, from 1972 to 1982, Kleartone Inc. ("Kleartone") occupied a solvent storage room at the 101 Frost Street Site which had a floor drain that discharged to the cesspool on the site. (State 56.1, ¶¶ 42-43). The Frost Street Defendants dispute those contentions only on the basis that "[t]here is no evidence in the record that the solvent room had any releases of hazardous substances." (FSD Counter., ¶ 42). Nonetheless, it is undisputed that the solvents used by Kleartone included TCE and 1,1,1-TCA. (FSD Counter., ¶ 44).

According to the State, Nat Bassen Textiles used the 101 Frost Street Site for textile manufacturing and had documented use of de-greasers and other unknown chemicals. (State 56.1, ¶ 41). Although the Frost Street Defendants do not dispute that Nat Bassen Textiles used de-greasers, they contend that "[t]here is no evidence in the record the use of degreasers resulted in a release at the site." (FSD Counter., ¶ 41).

The Autoline tenants conducted manufacturing and/or assembly activity at the site. (FSD Counter., ¶ 45). The State contends (a) that "[m]any of the soil and groundwater contaminants identified in the OU-2 ROD were utilized in the manufacturing process carried out by Autoline tenants at the 101 Frost Street Site[,]" (State 56.1, ¶ 48); (b) that "many of the VOCs identified in the OU-2 ROD were utilized by the Autoline tenants for cleaning and manufacturing products at the 101 Frost Street Site[,]" (id., ¶ 49); (c) that those "VOCs were discharged by the Autoline tenants into the 101 Frost Street Site's septic system that discharged into a number of drywells located at the 101 Frost Street Site[,]" (id., ¶ 50); (d) that "many of the heavy metals and semi-volatile compounds found in materials used by the Autoline tenants in their manufacturing

process have been identified in the RODs as present in the soils and groundwater[,]" (id., ¶ 51); and (e) that "[t]he Autoline tenants also discharged and/or spilled th[o]se compounds in the on-site sanitary and leaching system[,]" (id., ¶ 52). However, the Frost Street Defendants dispute those contentions on the basis that they were "alleged in the [Frost Street Defendants'] Third-Party Complaint based upon statements in the OU-3 ROD[]" and that "[n]o factual basis for [those contentions] was revealed during discovery."[8] (FSD Counter., ¶¶ 48-52).

C.      The 770 Main Street Site

The 770 Main Street Site, also known as the Former Applied Fluidics Site, is comprised of approximately one (1) acre of land in North Hempstead. (FSD Counter., ¶ 56). The 770 Main Street Site utilized an on-site sanitary system and numerous drywells until February 1983, when it was connected to the municipal sewer system. (Id., ¶ 58).

Certain tenants and subtenants utilized a facility located on the site for commercial activities and warehousing between approximately 1958 through 1998, when the structure was demolished. (FSD Counter., ¶ 57). Specifically, the 770 Main Street Site was occupied, (a) by defense contractors Allard Instruments and Applied Fluidics, Inc. ("Applied Fluidics"), which engaged in manufacturing activities at the site, between 1969 and 1982, (id., ¶ 59); and (b) by Applied Fluidics, which used TCE and compounds containing PCE in its operations, from 1974

_____

[8] Although the Frost Street Defendants challenge the evidentiary weight of the statements contained in the State's OU-3 ROD that support the State's factual assertions in its 56.1 Statement, (see, e.g. FSD Counter., ¶¶ 48-52, 79-80), they rely upon that same document, as well as, inter alia, the EPA's OU-1 ROD, and other similar documents, in support of many of the factual assertions they make in their "Statement of Additional Undisputed Facts in Support of [Their] Cross-Motion" ("FSD Add'l Facts") (See, e.g. FSD Add'l Facts, ¶¶ 1-3, 6-8, 10, 17).

to 1982.  (Id., ¶¶ 60-62).

The NYDEC's investigations of the 770 Main Street Site in the 1990s found PCE and TCE in the soil and groundwater at the site.  (FSD Counter., ¶ 63).  The environmental investigations carried out by the NYDEC and its consultants identified numerous hazardous substances present in the shallow soil, deep soil and groundwater at the 770 Main Street Site.  (Id., ¶ 64).  During a PSA in 1995, soil samples containing PCE up to 0.39 parts per million ("ppm") were collected near the northwest corner of the 770 Main Street Site, in close proximity to a former cesspool.  (Id., ¶ 65).  The Frost Street Defendants dispute the State's contention that those soil sample are an indication of past disposal and contend that "[t]here are no facts in the record indicating that disposal occurred on the 770 Main Street Site[.] . . . [and] many soil samples collected from the site had no indication of contamination."  (Id.)  However, it is undisputed (a) that PCE contamination was found in soils at two (2) locations within the 770 Main Street Site during the PSA, including at a concentration of three hundred ninety parts per billion (390 ppb), or three hundred ninety micrograms per kilogram (390 μg/kg), (id., ¶ 66); and (b) that concentrations of PCE as high as fifty thousand micrograms per kilogram (50,000 μg/kg) were detected in a sample collected directly below the location of a suspected cesspool at the site.  (Id., ¶ 67).

D.      The Frost Street Defendants

Next Millennium currently owns the 89 Frost Street Site and the 770 Main Street Site; has owned those properties since January 8, 1998; and is the successor-in-interest to various prior owners of those properties, including Jerry Spiegel ("Spiegel").  (FSD Counter., ¶¶ 68-69).

Spiegel, now deceased, owned (a) the 89 Frost Street Site between 1958 and 1995, and during the time hazardous substances, including PCE, were released at the site; and (b) the 770 Main Street Site between 1964 and 1979.[9] (Id., ¶¶ 73-73).

101 FSA currently owns the 101 Frost Street Site; has owned that property since February 24, 1997; and is the successor-in-interest to various prior owners of that property, including Spiegel. (FSD Counter., ¶¶ 70-71). Spiegel owned the 101 Frost Street Site between 1958 and 1966. (Id., ¶ 73).

Next Millennium and 101 FSA are real estate holding companies without employees, and are managed by Jerry Spiegel Associates, Inc. ("Spiegel Associates"), which is owned by the Estate of Jerry Spiegel. (FSD Counter., ¶¶ 72, 77). Prior to his death in 2009, Spiegel was a managing member of Next Millennium and the president of 101 Frost Street Corp., the general partner of 101 FSA. (Id., ¶ 76).

### E.     The State's Response Costs at the Frost Street Sites

In 1998, the NYDEC conducted a state-funded Remedial Investigation/Feasability Study ("RI/FS") at the Frost Street Sites and determined the presence of hazardous substances, including PCE, TCE and 1,1,1-TCA, in the soil and groundwater beneath and downgradient of the Sites in excess of State soil and groundwater standards. (FSD Counter., ¶ 78). The State contends: (1) that "[d]uring its investigation, DEC discovered that the Frost Street Sites are

---

[9] On December 7, 2009, counsel for the Frost Street Defendants notified the Court of Jerry Spiegel's death. Alan Eidler, Lise Spiegel Wilks and Pamela Spiegel Sanders, as co-executors of the Last Will and Testament of Jerry Spiegel and duly authorized administrators of the Estate of Jerry Spiegel, were substituted as defendants in this action in place of Jerry Spiegel.

composed of numerous pits, wells, leaching pools, ditches, and lagoons wherein hazardous substances have been deposited, disposed, placed and located[,]" (State 56.1, ¶ 79); and (2) that "[h]azardous waste at the Frost Street Sites was disposed through the sanitary system and other systems[,]" (id., ¶ 80).  Although the Frost Street Defendants do not dispute that disposal occurred at the 89 Frost Street Site, they contend that their "Third-Party Complaint alleges releases occurred at the 770 Main Street Site and 101 Frost Street Site based upon statements in the OU-1, OU-2 [and/or] OU-3 RODs[,] [but] [f]ollowing completion of discovery, no information exists supporting the discharge of hazardous substance at these two sites."  (FSD Counter., ¶¶ 79-80).

The State further contends that since "[t]here was no public sewer service for the Frost Street Sites until 1983[,] [a]ll effluent generated at the sites was disposed of by pumping, pouring, emitting, emptying, discharging, dumping and disposing of commercial waste generated into the septic and leaching system that serviced the sites."  (State 56.1, ¶¶ 81-82).  The Frost Street Defendants dispute those contentions on the basis that "[t]here is insufficient evidence in the record to determine if waste generated at the 770 Main Street Site and the 101 Frost Street Site were disposed of off-site."  (FSD Counter., ¶¶ 81-82).

Although it is undisputed that the operations conducted at the 89 Frost Street Site generated hazardous substances as defined by 42 U.S.C. § 9601(14), the Frost Street Defendants dispute the State's contentions (a) that the operations conducted at the 770 Main Street Site and the 101 Frost Street Site generated hazardous substances, (FSD Counter., ¶ 83); (b) that "[t]he hazardous substances were released at [those] sites by the disposal of the hazardous substances into the sanitary septic, leaching system, and onto the soils and into the groundwater[,]" (State

14

56.1, ¶ 84); and (c) that "[b]ased on the RI/FS, [the NYDEC] issued three Records of Decision in March 2000 that described the selected remedies for the contaminated soils at each of the three sites[,]" (id., ¶ 85), on the basis that "[f]ollowing the completion of discovery, there are no facts in the record supporting [the] allegation [that hazardous waste was generated at the 770 Main Street Site and 101 Frost Street Site]."  (FSD Counter., ¶¶ 83-85).

Nonetheless, it is undisputed that "[t]he groundwater contamination *emanating from each of the Frost Street Sites* comingle [sic], such that the contamination from one site mixes with the contamination from the adjacent sites as the groundwater moves downgradient under each site, forming a common plume of contaminants."  (FSD Counter., ¶ 87) (emphasis added).  Since the contamination emanating from each of the three (3) Frost Street Sites is co-mingled and forms a single plume of VOC contamination, the NYDEC addressed groundwater contamination beneath the Frost Street Sites as a single operable unit, *i.e.*, OU-2.  (Id., ¶ 88).  The OU-2 ROD requires the installation of an air sparging/soil vapor extraction ("AS/SVE") system to address the VOC contamination in the groundwater source areas and an in-well vapor stripping system to address the deeper contamination along Old Country Road.  (Id., ¶ 89).  It is also undisputed that "[d]isposal of hazardous substances *on the three Frost Street Sites* has contaminated the groundwater beneath the sites and migrated off-site into [State OU-3/EPA-OU-1]".  (FSD Counter., ¶ 90) (emphasis added).

The Frost Street Defendants dispute the State's contention that in January 2003, Next Millennium and 101 FSA "entered into Remedial Design/Remedial Action consent orders to implement the soil and groundwater remedies selected in the March 2000 RODs[,]" (State 56.1, ¶ 91), on the basis that "[t]here is no factual evidence in the record that disposal of hazardous

waste occurred at the 101 Frost Street [S]ite or the 770 Main Street [S]ite." (FSD Counter., ¶ 91). However, the Frost Street Defendants do not dispute that hazardous substances released at the 89 Frost Street Site migrated into State OU-3/EPA OU-1. (Id.)

The Frost Street Defendants also dispute the State's contention that they "have not implemented the selected remedy for OU-2 of the Frost Street Sites[,]" (State 56.1, ¶ 92), and contend that they "have implemented and operated an [AS/SVE system] for nearly 10 years as required by the OU-2 remedy. . . [and] have a pending request with the [NY]DEC to do pre design [sic] investigation work on a second system, which [the NY]DEC refuses to permit." (FSD Counter., ¶ 92).


F.    The Frost Street Defendants' Additional Undisputed Facts

The following are the only undisputed facts relating to the Frost Street Defendants' cross motion for summary judgment on their affirmative defense of divisibility of damages:

In its Record of Decision pertaining to State OU-3/EPA OU-1 dated October 2003 ("the NYDEC OU-3 ROD"), the NYDEC identifies (a) three (3) separate plumes; (b) the sites that contributed to each plume; and (c) the Frost Street Defendants' properties and the property of Utility Manufacturing Corp. as the contributors to the Eastern Plume. (State's Counter-Statement of Material Facts pursuant to Local Rule 56.1 and Statement of Additional Undisputed Facts ["State Counter."], ¶ 7). In the section of the NYDEC's OU-3 ROD entitled "Area of Historically Impacted Groundwater: 1977 to 2000," the NYDEC indicates that "[h]ydropunch data collected during the installation of the early warning wells indicate that below 150 ft bgs [feet below ground surface], the contaminant concentrations [in the Eastern Plume] drop off

rapidly," and that

> "[i]t appears that the [Eastern] [P]lume has not migrated vertically downward in this area [within the NCIA, north of Old Country Road]. It is not known whether this is a function of the time required to migrate to this depth or whether the fine-grained nature of the material at this depth is preventing downward migration."

(Declaration of Kevin Maldonado in Support of the Frost Street Defendants' Cross Motion for Summary Judgment ["Maldonado Decl."], Attachment ["A."] 4, p. 15-16). However, according to the State, subsequent testing, as set forth in the Pre-Design Investigation Evaluation Report for State OU-3/EPA OU-1 ("PDIE Report") prepared by HDR for the NYDEC in March 2010 and the Supplemental Feasability Study Technical Memorandum for State OU-3/EPA OU-1 ("SFS Memorandum") prepared by HDR/O'Brien & Gere Joint Venture ("HDR/OG") for the United States Army Corps of Engineers in July 2013, "reveal[ed] significant contamination in the Eastern Plume at depths far greater than 150 feet bgs." (State Counter., ¶ 8).

HDR installed a monitoring well (MW-15) between the known location of the Eastern Plume and the Central Plume and Bowling Green wells, and a single sample taken at a single depth of that monitoring well was non-detect for PCE and TCE. (State Counter., ¶ 10).

The SFS Memorandum "purport[s] to summarize historical groundwater data, characterize the nature and extent of contamination, and provide the basis for EPA's remedy selection." (State Counter., ¶ 1). However, based upon the opinion of its expert, Peter F. Andersen ("Andersen" or "the State's expert"), the State disputes the Frost Street Defendants' "assertion that the SFS Memorandum summarized all historical groundwater data, or that it fully characterized the nature and extend of contamination." (Id.)

A public hearing was conducted on August 15, 2013. (State Counter., ¶ 6).

Jeffrey Dyber, the NYDEC's project manager for State OU-3/EPA OU-1, reviewed the SFS Memorandum and the EPA's Record of Decision pertaining to State OU-3/EPA OU-1 dated September 2013 ("the EPA ROD"), (State Counter., ¶ 4), and the NYDEC concurred with the remedy selected by the EPA in the EPA ROD. (Id., ¶¶ 4-5).

G.      Undisputed Facts Regarding the State's NRD Claim

The following are the undisputed facts with respect to the Frost Street Defendants' motion for partial summary judgment dismissing the State's NRD Claim:

The State is seeking judgment declaring that the Frost Street Defendants are jointly and severally liable for natural resource damages, including the costs of assessing such damages. (State's Counter-Statement of Material Facts pursuant to Local Rule 56.1 and Statement of Additional Undisputed Facts ["State NRD Counter."], ¶¶ 1-2).

In the State's Memorandum of Law in Support of the Approval of the Consent Decrees, dated August 22, 2014, the State indicated that its settlement of the NRD claim and potential future NRD assessment "will focus on the impact of the downgradient groundwater contamination on Long Island's sole-source aquifer." (State NRD Counter., ¶ 3).

The State has not yet performed "an NRD pre-assessment or NRD Assessment," (State NRD Counter., ¶ 5), nor "assessed or calculated the damages to natural resources resulting from releases of contaminants at the NCIA." (Id., ¶¶ 4, 6-7).

In the opinion of Francis Reilly, the Frost Street Defendants purported expert on natural resource damages, groundwater is the only impacted natural resource in the NCIA. (State NRD Counter., ¶ 8).

The NYDEC OU-3 ROD and EPA ROD do not mention any well field or wells as being impacted by releases of contaminants at the NCIA other than the Bowling Green well field and wells, (State NRD Counter., ¶¶ 9, 10), but the State has not yet performed a natural resource damages assessment.  (Id.)

At all relevant times, State Maximum Contaminant Levels ("MCLs") for all VOCs of concern at the NCIA was and is 5 parts per billion.  (State NRD Counter., ¶ 11).  In late 1989, during the course of routine sampling by Bowling Green, amounts of TCE and PCE were detected in the Bowling Green wells below MCLs.  (Id., ¶ 12).  In response, the Town of Hempstead purchased and installed a granulated activated carbon ("GAC") treatment system in 1990, (id., ¶ 13), but, according to the State, VOCs were detected at levels above MCLs during subsequent sampling of untreated water at the Bowling Green wells.  (Id.)

In the summer of 1995, an air stripper tower was installed on the Bowling Green wells, which has since "worked in conjunction with the GAC system to treat and polish the water before it is distributed to the public."  (State NRD Counter., ¶ 14).  That same year, the NYDEC "agreed to repay 100% of the cost of the supplemental air stripper tower as a State Superfund remedial expense."  (Id., ¶ 15).  The NYDEC OU-3 ROD indicates that as of October 2003, "no site specific contaminants exceeding groundwater or drinking water standards were detected in water distributed to the public" based upon the use of the air stripping tower and GAC systems at Bowling Green.  (Id., ¶ 17).  The "same system of treating with the air stripping tower and polishing with the GAC remains in effect to this date at Bowling Green."  (Id., ¶ 16).  The Bowling Green Water District Commissioners from 1998 to the present each testified during their respective depositions (a) that the treatment systems used during their tenures effectively

removed VOCs from the groundwater prior to providing the water to the public, (id., ¶ 18); (b) that the water is routinely sampled for VOCs and they were not aware of any "exceedances of MCLs" after the treatment of the water, (id., ¶ 19); and (c) that the Bowling Green wells were never taken out of service for VOC contamination during their time as Commissioners, (id., ¶ 20).

VOCs taken from the water are emitted into the air. (Frost Street Defendants' Counter-Statement of Material Facts pursuant to Local Rule 56.1 to Additional Facts Presented by State in its Rule 56.1 Counter-Statement of Fact ["FSD NRD Counter."], ¶ 1).

The NYDEC has hired HDR to design a remedy for treatment of the OU-2 plume deeper than one hundred fifty feet below ground surface (150 ft. bgs). (State HDR Counter., ¶ 23). In addition, the NYDEC "has prepared a remedial design plan and hired a standby contractor to address portions of the plume beneath the Frost Street [S]ites that is deeper than 150 [feet] bgs." (Id., ¶ 25).

The EPA estimates that remediation of State OU-3/EPA OU-1 will take thirty (30) years. (FSD NRD Counter., ¶ 4).


II.     Discussion

    A.     Standard of Review

"A motion for summary judgment may properly be granted * * * only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009); see Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.")  In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted)); Vermont Right to Life Comm., Inc. v. Sorrell, 758 F.3d 118, 142 (2d Cir. 2014), cert. denied, 135 S. Ct. 949, 190 L. Ed. 2d 830 (2015) ("The role of the court on a summary judgment motion is to determine whether, as to any material issue, a genuine factual dispute exists." (quotations and citation omitted)).  "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York, 746 F.3d 538, 544 (2d Cir. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

 In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the nonmoving party," Dalberth v. Xerox Corp., 766 F.3d 172, 182 (2d Cir. 2014) (quotations and citation omitted), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Smith v. County of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (quotations and citation omitted); accord Delaney v. Bank of America Corp., 766 F.3d 163, 167 (2d Cir. 2014).  "An issue of fact is genuine 'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" Dalberth, 766 F.3d at 182 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505); see also Delaney, 766 F.3d at 168. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. 557, 129 S. Ct. at 2677 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); accord Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); see also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]") "[W]hen the moving party has carried its burden * * *, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts * * *[,]" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting Matsushita Elec., 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful." Miner v. Clinton County, N.Y., 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment by "adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (quoting Anderson, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely

speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Fabrikant, 691 F.3d at 205 ("[C]onclusory statements or mere allegations will not suffice to defeat a summary judgment motion." (quotations and citation omitted)).

B.      Liability under Section 107(a) of CERCLA

"CERCLA's primary purposes are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." Price Trucking Corp. v. Norampac Indus., Inc., 748 F.3d 75, 79 (2d Cir. 2014) (quotations and citation omitted); accord ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014), cert. denied, 135 S. Ct. 715, 190 L. Ed. 2d 441 (2014). "In furtherance of these purposes, the statute imposes strict liability on owners and facility operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site." Price Trucking, 748 F.3d at 79-80.

"To make out a prima facie case for liability under [CERCLA], a plaintiff must establish that: (1) the defendant is an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)–(4); (2) the site is a 'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan." Price Trucking, 748 F.3d at 80; see also Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 163 (2d Cir. 1999) ("[T]o establish a prima facie case of liability, a plaintiff must show that (1) the site is a 'facility' as defined in CERCLA, (2) a release or threatened release of a hazardous substance has occurred, (3) the release or threatened release has caused the plaintiff to incur

response costs that were necessary and consistent with the National Contingency Plan set up by CERCLA, and (4) the defendants fall within one or more of the four classes of responsible persons described in CERCLA § 107(a).")  "Once the plaintiff establishes these elements, the defendant is strictly liable for the presence of the hazardous substances unless it succeeds in invoking one of the statutory defenses set forth in § 107(b) (42 U.S.C. § 9607(b))."  <u>Prisco v. A & D Carting Corp.</u>, 168 F.3d 593, 603 (2d Cir. 1999).

        1.        The Frost Street Defendants are Responsible Parties

Section 107(a) of CERCLA imposes liability upon the following four (4) classes of responsible parties:

> "(1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance. . . ."

42 U.S.C. § 9607(a).  "Section 9607(a)(1) applies to all current owners and operators, while [S]ection 9607(a)(2) primarily covers prior owners and operators."  <u>State of New York v. Shore Realty Corp.</u>, 759 F.2d 1032, 1044 (2d Cir. 1985).

Since "section 9607(a)(1) unequivocally imposes strict liability on the current owner of a

facility from which there is a release or threat of release, without regard to causation[,]" Shore Realty, 759 F.2d at 1044, and it is undisputed that Next Millennium and 101 FSA are the current owners of the Frost Street Sites, they are responsible parties under Section 107(a) of CERCLA. See, e.g. State of New York v. Lashins Arcade Co., 91 F.3d 353, 359 (2d Cir. 1996) (holding that the current owner of the facility was a responsible party under Section 9607(a)(1), notwithstanding that it did not own the facility at the time of disposal of the hazardous substances, and, thus, could be held strictly liable for the State's response costs unless it could satisfy one of CERCLA's affirmative defenses).

For purposes of Section 9607(a)(2), CERCLA provides that the term "disposal" "shall have the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C.A. § 6903]," 42 U.S.C. § 9601(29) (brackets in original), which defines the term "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); see also Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 178 (2d Cir. 2003). Accordingly, to make out a *prima facie* case under Section 9607(a)(2), the State must "establish that a spill, discharge, leak, etc., occurred at the time the defendants controlled the site." ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 356 (2d Cir. 1997); see also Shore Realty, 759 F.2d at 1044 ("Prior owners and operators are liable only if they owned or operated the facility 'at the time of disposal of any hazardous substance'; this limitation does not apply to current owners[.]")

It is undisputed that Jerry Spiegel owned the 89 Frost Street Site between 1958 and 1995,

and during the time hazardous substances were disposed of at that site. Thus, Alan Eidler, Lise Spiegel Wilks and Pamela Spiegel Sanders, as co-executors of the Last Will and Testament of Jerry Spiegel and duly authorized administrators of the Estate of Jerry Spiegel, who were substituted for Jerry Spiegel following his death, are responsible parties, at least with respect to the 89 Frost Street Site, under Section 9607(a)(2). See, e.g. United States v. Atlas Lederer Co., 494 F. Supp. 2d 649, 654-57 (S.D. Ohio 2007) (granting the plaintiff's motion to substitute the estate and executor of the deceased defendant in a CERCLA cost recovery action); Canadyne-Georgia Corp. v. Bank of America, N.A., 174 F. Supp. 2d 1337, 1354 (M.D. Ga. 2001) ("If a decedent would have been a liable party under CERCLA were he presently alive, the plaintiff should be allowed to look to the decedent's assets, in the hands of the estate or the estate's beneficiaries, to satisfy that liability." (quotations and citation omitted)); Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 475 (D. N.J. 1992) ("[A] decedent's estate may be liable for cleanup costs.")

2.      The Frost Street Sites are "Facilities"

Section 101(9) of CERCLA defines the term "facility" to mean "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9). Since, *inter alia*, it is undisputed that hazardous substances were found to be located in the soil and

groundwater on each of the Frost Street Sites, each site is clearly a "facility" within the meaning

of CERCLA.


        3.      Release of a Hazardous Substance

Section 101 (22) defines the term "release" to mean

> "any spilling, leaking, pumping, pouring, emitting, emptying, discharging,
> injecting, escaping, leaching, dumping, or disposing into the environment
> (including the abandonment or discarding of barrels, containers, and other closed
> receptacles containing any hazardous substance or pollutant or contaminant), but
> excludes (A) any release which results in exposure to persons solely within a
> workplace, with respect to a claim which such persons may assert against the
> employer of such persons, (B) emissions from the engine exhaust of a motor
> vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C)
> release of source, byproduct, or special nuclear material from a nuclear incident,
> as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011
> et seq.], if such release is subject to requirements with respect to financial
> protection established by the Nuclear Regulatory Commission under section 170
> of such Act [42 U.S.C.A. § 2210], or, for the purposes of section 9604 of this title
> or any other response action, any release of source byproduct, or special nuclear
> material from any processing site designated under section 7912(a)(1) or 7942(a)
> of this title, and (D) the normal application of fertilizer."

42 U.S.C. § 9601(22).  The term "leaching" within that definition "is commonly used to describe

passive migration[.]" ABB Indus., 120 F.3d at 358; see also Westfarm Assocs. Ltd. P'ship v.

Washington Suburban Sanitary Comm'n, 66 F.3d 669, 680 (4th Cir. 1995) ("'[L]eaking,'

'leaching,' and 'escaping' are all words which imply passive conduct.")  The term "environment"

includes "surface water, ground water, drinking water supply, land surface or subsurface strata,

or ambient air within the United States or under the jurisdiction of the United States."  42 U.S.C.

§ 9601(8)(B).

        Since CERCLA's definition of the term "release" "contemplates a broad, remedial view

of how hazardous substances can find their way into the environment without their affirmative

discharge by an owner or operator of a facility[,] . . . only minimal thresholds are necessary to

demonstrate a release." Rhodes v. County of Darlington, S.C., 833 F. Supp. 1163, 1178 (D. S.C.

1992); see also Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669 (5th Cir. 1989) (""[T]he

definition of 'release' should be construed broadly. . ., to avoid frustrating the beneficial

legislative purposes." (quotations, brackets and citations omitted)); United States v. Domenic

Lombardi Realty, Inc., 204 F. Supp. 2d 318, 329-30 (D. R.I. 2002) ("Courts have interpreted

th[e] definition [of 'release'] broadly and have consistently rejected attempts to limit CERCLA's

reach [] through restrictive interpretations of the term 'release.'" (quotations and citation

omitted)).

Section 101(14) of CERCLA defines the term "hazardous substance" to mean:

> "(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal
> Water Pollution Control Act [33 U.S.C.A. § 1321(b)(2)(A)], (B) any element,
> compound, mixture, solution, or substance designated pursuant to section 9602 of
> this title, (C) any hazardous waste having the characteristics identified under or
> listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. §
> 6921] (but not including any waste the regulation of which under the Solid Waste
> Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of
> Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water
> Pollution Control Act [33 U.S.C.A. § 1317(a)], (E) any hazardous air pollutant
> listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any
> imminently hazardous chemical substance or mixture with respect to which the
> Administrator has taken action pursuant to section 7 of the Toxic Substances
> Control Act [15 U.S.C.A. § 2606]. The term does not include petroleum,
> including crude oil or any fraction thereof which is not otherwise specifically
> listed or designated as a hazardous substance under subparagraphs (A) through (F)
> of this paragraph, and the term does not include natural gas, natural gas liquids,
> liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas
> and such synthetic gas)."

42 U.S.C. § 9601(14). "A substance need only be designated as hazardous under any *one* of the four environmental statutes or under Table 302.4 [of 40 C.F.R. § 302] to be a hazardous substance under CERCLA." <u>B.F. Goodrich Co. v. Murtha</u>, 958 F.2d 1192, 1200 (2d Cir. 1992) (emphasis in original). "Liability under CERCLA depends only on the presence in any form of listed hazardous substances." <u>Id.</u> at 1201.

"Pursuant to subsection (B) [of Section 101(14) of CERCLA] and under § 9602, the EPA has listed over 700 hazardous substances in Table 302.4 of 40 C.F.R. § 302[,]" <u>B.F. Goodrich</u>, 958 F.2d at 1200, including PCE[10], TCE and 1,1,1-TCA. <u>See</u> Table 302.4 of 40 C.F.R. § 302. It is undisputed, *inter alia*: (a) that solvents containing one or more of those hazardous substances were located in the septic system utilized at the 89 Frost Street Site before it was connected to the municipal sewer system in 1983; (b) that Marvex, one of the tenants at the 89 Frost Street Site, discharged the solvents it used in its manufacturing process into the on-site sanitary system; (c) that Marvex released PCE at the 89 Frost Street Site; (d) that hazardous PCE and/or TCE were used by at least two (2) of the tenants that occupied the 101 Frost Street Site, and one of the tenants that occupied the 770 Main Street Site, prior to February 1983, when those sites utilized only an on-site sanitary system; (e) that PCE and TCE were detected above guidance levels in the soil at the 101 Frost Street Site; (f) that PCE and TCE were found in the soil and groundwater, and PCE was found in close proximity to a former cesspool, and directly below a suspected cesspool, at the 770 Main Street Site; (g) that "[d]isposal of hazardous substances *on the three*

---

[10] Tetrachloroethylene is also known as "PCE," "perc," or perchloroethylene. <u>See</u> In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig., 725 F.3d 65, 89 n. 6 (2d Cir. 2013), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u> Exxon Mobil Corp. v. City of New York, N.Y., 134 S. Ct. 1877, 188 L. Ed. 2d 948 (2014). Perchloroethylene is one of the hazardous substances listed in Table 302.4.

*Frost Street [S]ites* has contaminated the groundwater beneath the sites and migrated off-site into

OU-3[,]" (FSD Counter., ¶ 90) (emphasis added); (h) that "groundwater contamination

*emanating from each of the Frost Street Sites* comingle, such that the contamination from one

sites [sic] mixes with the contamination from the other adjacent sites as the groundwater moves

downgradient under each site, forming a common plume of contaminants[,]" (FSD Counter., ¶

87) (emphasis added); and (i) that the NYDEC "addressed groundwater contamination beneath

the Frost Street Sites as a single operable unit ('OU-2') because the contamination *emanating*

*from the three sites* is comingled and forms a single plume of VOC contamination[,]" (id., ¶ 88)

(emphasis added). Accordingly, the State has established that hazardous substances were

released at each of the Frost Street Sites. See, e.g. Westfarm Assocs., 66 F.3d at 680 (finding

that the term "release" includes migrating releases which travel through various properties);

Canadyne-Georgia, 174 F. Supp. 2d at 1349 (finding that evidence, *inter alia*, of hazardous

substances in the soil at the site "sufficiently establishes a release of a hazardous substance into

the environment."); Artesian Water Co. v. Gov't of New Castle County, 659 F. Supp. 1269,

1281-82 (D. Del. 1987), aff'd, 851 F.2d 643 (3d Cir. 1988) (finding that the plaintiff had made a

showing of a release or threatened release of hazardous substances from, *inter alia*, the

undisputed fact that hazardous substances were present in the groundwater around the site);

Domenic Lombardi Realty, 204 F. Supp. 2d at 330-31 (holding that the presence of contaminated

soil at the site constituted a "release."); HRW Systems, Inc. v. Washington Gas Light Co., 823 F.

Supp. 318, 341 (D. Md. 1993) ("Given the breadth of the definitional language in CERCLA, it

seems virtually impossible to conceive of a situation where hazardous substances are found in the

soil and not *ipso facto* 'released' into the environment."); Mid Valley Bank v. North Valley

Bank, 764 F. Supp. 1377, 1387 (E.D. Cal. 1991) (finding that the "release of a hazardous substance" element was satisfied by evidence supporting the presence of allegedly elevated levels of hazardous substances in the soil samples of the site); U.S. v. Hardage, 761 F. Supp. 1501, 1510 (W.D. Okla. 1990) ("The presence of hazardous substances in the soil, surface water, or groundwater of a site demonstrates a release.")

4.    The State Incurred Response Costs

Section 107(a) CERCLA imposes upon the responsible parties designated therein liability for, *inter alia*, "all costs of removal or remedial action incurred by . . . a State . . . not inconsistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(A); see also 42 U.S.C. § 9601(25) (defining the terms "respond" or "response" to mean "remove, removal, remedy, and remedial action;, [sic] all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto."); New York v. Next Millennium Realty, LLC, 732 F.3d 117, 124 (2d Cir. 2013) ("Section 107 of CERCLA authorizes federal and state governments to recover response costs from potentially responsible parties ('PRPs') for both removal and remedial actions."); Shore Realty, 759 F.2d at 1041 (finding that Section 107(a) of CERCLA authorizes states to "sue responsible parties for remedial and removal costs if such efforts are 'not inconsistent with' the NCP.")  CERCLA defines the terms "remove" or "removal" to mean:

"the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or

threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.]."

42 U.S.C. § 9601(23). "Removal actions are generally clean-up measures taken in response to immediate threats to public health and safety[,]" New York State Elec. & Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 230 (2d Cir. 2014); accord Next Millennium, 732 F.3d at 124-25, and "are also generally designed to address contamination at its endpoint and not to permanently remediate the problem." FirstEnergy, 766 F.3d at 231. "[M]easures taken to minimize and mitigate contamination, but not to permanently eliminate it, are properly classified as removal actions." Id. at 233.

The terms "remedy" or "remedial action" are defined as:

"those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated

contaminated materials."

42 U.S.C. § 9601(24).  "Remedial actions are typically actions designed to permanently remediate hazardous waste[,]"  FirstEnergy, 766 F.3d at 231; accord Next Millennium, 732 F.3d at 125, and "generally refer[] to the final remedy selected to address the contamination at the hazardous waste site."  W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc., 559 F.3d 85, 92 (2d Cir. 2009).

"Generally, response costs are liberally construed under CERCLA[,]" W.R. Grace, 559 F.3d at 92, and include, *inter alia*, investigation costs, see Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 133 (2d Cir. 2010); enforcement activities, see W.R. Grace, 559 F.3d at 92; and "costs in assessing the conditions of the site and supervising the removal of the . . . hazardous [substances]. . ." from the site.  Shore Realty, 759 F.2d at 1042-43.  The State has established that it incurred response costs related to State OU-3/EPA OU-1 as a result of the releases of hazardous substances from the Frost Street Sites in the total amount of four million nine hundred eighty-six thousand four hundred thirteen dollars and fifty-five cents ($4,986,413.55) for its investigation of the sites and actions undertaken to respond to immediate threats to public health, including, *inter alia*, reimbursing the Town of Hempstead for the construction of an air stripper tower.  See, e.g. Next Millennium, 732 F.3d at 126-27 (holding, *inter alia*, that the construction of the air stripper tower was a removal action).

5.      Consistency with the NCP

"The National Contingency Plan is essentially the federal government's toxic waste playbook, detailing the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment." Chevron, 596 F.3d at 136. "Adherence to the [NCP] is the gatekeeper to seeking reimbursement of response costs." Id.

"Courts presume that actions undertaken by the federal, or a state, government are consistent with the National Contingency Plan." Chevron, 596 F.3d at 137. "Therefore, the defendants bear the burden of proving inconsistency by showing that the State 'acted arbitrarily and capriciously in choosing a particular response action.'" New York v. Adamowicz ("Adamowicz I"), 932 F. Supp. 2d 340, 344-45 (E.D.N.Y. 2013) (quoting B.F. Goodrich v. Betkoski, 99 F.3d 505 (2d Cir. 1996), overruled on other grounds by New York v. Nat'l Servs. Indus., 352 F.3d 682, 685-87 (2d Cir. 2003)). As defendants have not established that the State acted arbitrarily and capriciously with respect to any of the response actions for which it seeks reimbursement of its costs, it is presumed that the actions undertaken by the State were consistent with the NCP. Accordingly, the State has established a prima facie claim for liability under Section 107(a) of CERCLA against the Frost Street Defendants.[11]

---

[11] The branch of the State's motion seeking summary judgment on its claim for further response costs under Section 107 of CERCLA, 42 U.S.C. § 9607, is denied since that claim was severed and administratively closed pursuant to this Court's order dated July 27, 2015, (DE 441).

B.       Affirmative Defense for Divisibility of Harm

The Frost Street Defendants cross-move pursuant to Rule 56 of the Federal Rules of Civil

Procedure for summary judgment on their fifth affirmative defense of divisibility of harm.

Although CERCLA "impose[s] a strict liability standard,. . . it [does] not mandate 'joint

and several liability in every case." Burlington N. & Sante Fe Ry. Co. v. United States, 556 U.S.

599, 613, 129 S. Ct. 1870, 173 L. Ed. 2d 812 (2009) (quotations and citations omitted). "Rather,

Congress intended the scope of liability to be determined from traditional and evolving principles

of common law." Id. (quotations and citation omitted).  "As a result, the divisibility of harm

doctrine is a common law tort defense to joint and several liability under CERCLA § 9607(a)."

APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc., 999 F. Supp. 2d 590, 623 (S.D.N.Y. 2014);

see also U.S. v. Agway, Inc., 193 F. Supp. 2d 545, 547 (N.D.N.Y. 2002) ("A limited defense [to

joint and several liability in CERCLA cases] is available to defendants who have been found

liable for response costs based upon the common law doctrine of divisibility of harm.")  "It is not

a defense arising under CERCLA itself." APL Co., 999 F. Supp. 2d at 623.

"[T]he universal starting point for divisibility of harm analyses in CERCLA cases is §

433A of the Restatement (Second) of Torts[,]" Burlington, 556 U.S. at 614, 129 S. Ct. 1870,

which provides,

> "(1) Damages for harm are to be apportioned among two or more causes where (a)
> there are distinct harms, or (b) there is a reasonable basis for determining the
> contribution of each cause to a single harm.  (2) Damages for any other harm
> cannot be apportioned among two or more causes."

Restatement (Second) of Torts § 433A (1965); see also Id. § 881 (1979) ("If two or more

persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused."); Id. § 875 (1979) ("Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.")  "In other words, apportionment is proper when there is a reasonable basis for determining the contribution of each cause to a single harm." Burlington, 556 U.S. at 614, 129 S. Ct. 1870 (quotations and citation omitted).

    "CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists." Burlington, 556 U.S. at 614, 129 S. Ct. 1870.  "When two or more causes produce a single, indivisible harm, courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." Id. at 614-15, 129 S. Ct. 1870 (quotations and citation omitted).  "Thus, to avoid joint and several liability pursuant to CERCLA § 9607(a) under the divisibility doctrine, a defendant bears the burden of proving that the harm is divisible and there is a reasonable basis for apportionment." APL Co., 999 F. Supp. 2d at 624; accord Agway, 193 F. Supp. 2d at 548; see also U.S. v. Alcan Aluminum Corp. ("Alcan III") 315 F.3d 179, 186 (2d Cir. 2003) ("In order to avoid the imposition of joint and several liability under CERCLA, the [defendant] must (1) demonstrate that the harm caused by its emulsion was 'distinct' from the harm caused by other contributors at [the sites] or (2) proffer a reasonable basis for determining

the proportional contribution of its emulsion to what may be conceived of as a single harm at each site.")  The burden to establish divisibility is "substantial[,]" <u>Alcan III</u>, 315 F.3d at 187, and the defendant "must look at the potential effects of its emulsion as a whole rather than the individual components of the emulsion" in order to satisfy its burden of proof.  <u>U.S. v. Alcan Aluminum Corp. ("Alcan II")</u>, 97 F. Supp. 2d 248, 269 (N.D.N.Y. 2000), <u>aff'd</u>, 315 F.3d 179 (2d Cir. 2003).  "Whether a particular harm is divisible, and thus capable of apportionment, is a question of law[,]" <u>APL Co.</u>, 999 F. Supp. 2d at 625; <u>accord</u> <u>U.S. v. NCR Corp.</u>, 688 F.3d 833, 838 (7th Cir. 2012), whereas the issue of how to apportion the damages is a question of fact.  <u>See</u> <u>NCR Corp.</u>, 688 F.3d at 838.

"The divisibility doctrine *is not* a means by which courts allocate the costs incurred in a cleanup and response operation among PRPs on an equitable basis (i.e., on the basis of relative fault)."  <u>APL Co.</u>, 999 F. Supp. 2d at 624 (emphasis in original); <u>see also</u> <u>PCS Nitrogen Inc. v. Ashley II of Charleston LLC</u>, 714 F.3d 161, 182 (4th Cir. 2013) ("[E]quitable considerations play no role in the apportionment analysis[.]" (quoting <u>Burlington</u>, 556 U.S. at 615 n. 9, 129 S. Ct. 1870)); <u>U.S. v. Hercules, Inc.</u>, 247 F.3d 706, 718 (8th Cir. 2001) ("The divisibility of harm inquiry[] . . . is guided not be equity . . . but by principles of causation alone.")  "[T]he divisibility doctrine 'looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable, while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations.'"  <u>APL Co.</u>, 999 F. Supp. 2d at 625 (quoting <u>Burlington</u>, 556 U.S. at 615 n. 9,

129 S. Ct. 1870).

"Though causation is not an element of a CERCLA plaintiff's case, a CERCLA defendant asserting the divisibility defense may show that it caused only some part of the contamination, and how much." APL Co., 999 F. Supp. 2d at 625 (quotations and citation omitted). "The key to the divisibility doctrine remains separate causation—the extent to which separate parties caused separate harms." Id. "In making this determination, courts look to the contamination traceable to each defendant, . . . or what portion of the harm (i.e. the hazardous substances present at the facility and the response costs incurred in dealing with them) is fairly attributable to the defendant as opposed to other responsible parties." Id. (quotations and citations omitted). Factors relevant to the apportionment analysis include, *inter alia*, "percentages of land area, time of ownership, and types of hazardous products[,]" Burlington, 556 U.S. at 617-18, 129 S. Ct. 1870; see also APL Co., 999 F. Supp. 2d at 625-26 ("Divisibility can be based on a variety of factors including volumetric, chronological, or geographic considerations, as well as contaminant-specific considerations." (quotations and citation omitted)), as well as the "relative toxicity, migratory potential, degree of migration, and synergistic capacity of the hazardous substances at the site. . . ." Alcan III, 315 F.3d at 186. However, apportionment is "a fact-intensive, site-specific determination." PCS Nitrogen, 714 F.3d at 183.

"Evidence supporting divisibility must be concrete and specific." APL Co., 999 F. Supp. 2d at 626 (quoting Hercules, 247 F.3d at 718); see also Durham Mfg. Co. v. Merriam Mfg. Co.,

294 F. Supp. 2d 251, 267 (D. Conn. 2003) ("Proving divisibility is a very difficult proposition, . . . requiring concrete and specific evidence of causation of separate and distinct harms to the environment." (quotations and citation omitted)).  "[C]ourts lacking a reasonable basis for dividing causation should avoid apportionment altogether by imposing joint and several liability."  APL Co., 999 F. Supp. 2d at 626 (brackets in original) (quoting Hercules, 247 F.3d at 718-19); see also PCS Nitrogen, 714 F.3d at 183 ("[I]n the face of uncertain causation of harm, courts have refused to make an arbitrary apportionment for its own sake." (quotations and citation omitted)).  "Because a successful divisibility defense would often undermine Congress' determination that CERCLA liability should be joint and several, such a defense is the exception, however, not the rule."  APL Co., 999 F. Supp. 2d at 626 (quotations, brackets and citation omitted); see also U.S. v. Capital Tax Corp., 545 F.3d 525, 535 (7th Cir. 2008) ("Divisibility is the exception, however, not the rule.")


1.      Distinctiveness of Harm

The Frost Street Defendants have not satisfied their "substantial burden" of establishing divisibility of harm, Alcan III, 315 F.3d at 187, i.e., of demonstrating that the harm caused by the Eastern Plume is distinct from the harm caused by the Western and Central Plumes.  The Frost Street Defendants rely, *inter alia*, upon statements in the SFS Memorandum indicating, in relevant part, (1) that "there appears to be three separate plumes within [State OU-3/EPA OU-1] with different contaminant profiles[,]" (Maldonado Decl., A. 5 at 3-7); and (2) that in the State

OU-3/EPA OU-1 "eastern plume area, groundwater generally flows in a southern direction across the [State OU-3/EPA OU-1] study area," (id.), whereas the Central Plume groundwater flows in a southwestern direction and the Western Plume flows in a south-southwestern direction. (Id.) In addition, the Frost Street Defendants rely upon three (3) figures in the SFS Memorandum ("the HDR figures") depicting the Eastern Plume as being separate from the other plumes. (Id. at Figures 3-2, 3-3 and 3-4).

However, Andersen, the State's expert, who is a civil engineer and groundwater hydrologist, contends that the HDR figures were intended only "to collect data and facilitate the design of the remedy" and "are not appropriate for determination of past or present comingling [sic] of plumes or for the division of costs." (Declaration of Peter F. Andersen in Support of the State's Opposition to the Frost Street Defendants' Cross-Motion for Summary Judgment ["Andersen Decl."], ¶ 12). According to Andersen, (1) "[t]he timeframe of the data used in the construction of the HDR figures. . . does not adequately represent past or present conditions from which one can determine plume differentiation[,]" (id., ¶ 13(a)); (2) "the plume contour maps shown on Figure 3.2 of the [SFS Memorandum] used concentration data from 2011 to draw the contours, without regard to concentration trend or values from 14 wells that had also been sampled in previous investigations[,] . . . [yet] [i]n 10 of those 14 wells, the pre-2011 sampling revealed higher concentrations of PCE than the 2011 sampling revealed,"[12] (id., at ¶ 13(a)(i)-(ii));

_____

[12] According to Andersen, "[a]n example of this can be seen in monitoring well EW-1B which had a PCE concentration of 74 µg/L in 20[08] and a concentration of 1000 µg/L in 2002, and a PCE concentration of 1.9 µg/L in 2011, which was recorded as a 'Non-Detect' on Figure 3[-]2. Mr. Caldwell [the Frost Street Defendants' expert] relies heavily on this 2011 non-detect in

and (3) "[t]he vertical placement, number of measurements and past concentration history of many of the data points used in the construction of the HDR figures. . . do not adequately represent past or present conditions from which one can determine plume differentiation[,]" (id., ¶ 13(b)).  Moreover, Thomas M. Connors, HDR's project manager for the SFS Memorandum and EPA ROD, testified during his deposition that  "[t]here is commingling between the plumes, . . . [and] they are not separate."  (Declaration of Nancy Christensen in Opposition to Frost Street Defendants' Cross-Motion for Summary Judgment ["Christensen Decl."], Ex. A at 28:10-18).

The Frost Street Defendants also rely upon statements in the NYDEC's OU-3 ROD to support their assertions, *inter alia*, (1) that the NYDEC "identifies three separate plumes with different chemical markers," (FSD Add'l Facts, ¶ 7); and (2) "that the Central Plume, not Eastern or Western plumes, 'extends into the vicinity of the Bowling Green well field."  (Id.).  However, the NYDEC OU-3 ROD states, in relevant part: (1) that "contouring resulted in three individual plume areas over three of the [four] depth intervals examined (0-64 ft bgs, 64-100 ft bgs, 100-125 ft bgs) with the exception of the deepest level (125-200 ft bgs) where only two apparent

---

well EW-1B when opining that the plumes are separate and distinct."  (Andersen Decl., ¶ 13(a)(iii)).  Andersen avers that "if one were to draw the plume contours using the 2002 or 2008 measurements of 1000 µg/L and 74 µg/L, clearly the plumes would not appear separate and distinct."  Andersen also challenges Mr. Caldwell's "reli[ance] on one 'non-detect' PCE measurement from well MW-15 (located in between the eastern plume and the Bowling Green well field) at a depth of 185-205 feet to support his opinion that the Eastern and Central plumes are divisible[]" on the basis that "[t]he 185-205 foot depth is likely too shallow to detect the plume[] [because] the WP-06 boring, which is located at a similar distance downgradient of Old Country Road[] shows nearly all the contamination present beneath a 200 ft depth . . . ."  (Id., ¶ 13(c)(i)).  According to Andersen, Caldwell's "[r]eliance on one sampling event, from a single depth of the saturated thickness of the aquifer is inadequate for determining the location of the plume."  (Id., ¶ 13(c)(ii)).

plume areas were found[,]" (Maldonado Decl., A. 4 at 15-16); (2) that the "source area" of the Eastern Plume is "centered about the Frost Street [S]ites[,]" (id. at 16); (3) that the primary contaminants of concern (a) in the Eastern Plume "is PCE and its associated breakdown products[,]" (id.), and (b) in the Central Plume "is 1,1,1-TCA and its breakdown products[,]" (id.), although "[s]ignificant concentrations of TCE and PCE were also found at certain sampling locations, *especially at the deeper depths off-site*[,]" (id.) (emphasis added); (4) that in the Western Plume, "significant concentrations of TCE, PCE, and 1,1,1-TCA are found throughout the plume[,]" (id. at 17); (5) that "*[a]t the deeper depths off-site, the [E]astern [P]lume and the [C]entral [P]lume are co-mingled[,]*" (id.) (emphasis added); and (6) that "[s]ince [the Central] [P]lume area extends into the vicinity of the Bowling Green well field the contaminant distribution with depth is critical[,]" (id.).

Moreover, attached to the NYDEC OU-3 ROD is a Responsiveness Summary providing the comments raised during the public comment period and the NYDEC's responses thereto. In response to a comment that "[t]o date, the NYSDEC has not demonstrated that the [E]astern [P]lume commingles with the [C]entral [P]lume and contaminates the Bowling Green water supply wells[,]" (Maldonado Decl., A. 4 at A-3), the NYDEC indicated:

> "The path of the [E]astern [P]lume lies within the radius of the cone of influence of the Bowling Green water supply wells. The [E]astern [P]lume reached concentrations of greater than 10,000 ppb of total VOCs. Given the high contaminant levels reached by the [E]astern and [C]entral plumes and the intersection of the [E]astern and [C]entral plume's path with the cone of influence of the production wells it is evident that contaminants from the two plumes commingle near the production wells and that both the [E]astern and [C]entral [P]lumes make a major contribution to the contamination found in the production wells."

(Id.)

Furthermore, the Frost Street Defendants rely upon the affidavit, report and rebuttal report of their expert, Brian E. Caldwell ("Caldwell"), who is a professional geologist and certified professional geologist. (Affidavit of Brian E. Caldwell, PG, CPG ["Caldwell Aff."], ¶ 1). Caldwell opines, *inter alia*, that "(1) the Eastern Plume is separate and distinct from the Central and Western Plumes; (2) [r]egionally the Eastern Plume flows in a south-southwesterly direction whereas the Central Plume flows in a more southwesterly direction; (3) the regional south-southwesterly flow of the Eastern Plume would indicate that it is flowing away from the Bowling Green wells; (4) there is horizontal separation of PCE at the 5 ppb level between the Eastern Plume and the Central Plume of at least 1200 feet at the northern most point (at Old Country Road and at depths of 150 feet); (5) there is approximately 4000 feet of horizontal separation between the Eastern and Central TCA Plumes at their southernmost inferred locations at the 5 ppb level; (6) [g]iven the flow directions and the chemical signature of the Eastern Plume, the data indicates the Eastern Plume has not impacted the Bowling Green wells[;] and (7) the Eastern [P]lume is responsible for 16% of the OU-3 impacts by geographical area of the biggest contaminant plume for each of the three plumes." (Id., ¶ 3).

In addition to Andersen's challenges to Caldwell's opinions set forth above, the State further challenges Caldwell's opinions on the grounds: (1) that his "opinion is based upon HDR's figures, which do not take into account historical sampling data[,]" (State Counter., ¶¶ 12-13); (2) that his calculations "ignore[] the unnamed plume identified on HDR Figures 3[-]2

and 3[-]3[,]"[13] (id.); and (3) that his opinion that the Eastern Plume has not impacted Bowling

Green wells (a) "is also based on HDR's conclusion that groundwater in the vicinity of the

Eastern Plume flows in a southerly direction, when [NY]DEC, its consultants, and consultants

working on upgradient sites have determined that flow is to the southwest or south-southwest[,]"

(id., ¶ 13), and "other consultants have determined that the Eastern Plume may be impacting the

Bowling Green Wells."  (Id.)  According to Andersen, (1) the HDR figures are "inconsistent with

Mr. Caldwell's own opinions regarding groundwater flow direction and hence, plume

trajectory[,]" i.e., with the south-southwesterly flow direction stated by Caldwell, (Andersen

Decl., ¶ 15); (2) Caldwell "failed to consider other investigations and plume contour maps that

provide additional information regarding the extent of contamination in [State OU-3/EPA OU-

1][,]" (id., ¶ 16), "support[ing] the conclusion that the Eastern plume is flowing in a south-

southwesterly direction," which is inconsistent with the HDR figures upon which Caldwell relies,

(id.); (3) "the consistency between the [Supplemental Remedial Investigation Technical

Memorandum ("SRI Memorandum")  prepared for the EPA by Lockheed Martin in 2013], [the

OU-3 PDI Report prepared for the NYDEC by Dvirka and Bartilucci in 2009], connection of

points from Frost Street to high concentrations south of Old Country Road, and groundwater

flow directions computed from water levels in site wells suggests that the true groundwater flow

direction in this area is south-southwesterly and NOT the southerly direction indicated by the

---

[13]  According to the State, HDR Figure 3-3 "depicts the Eastern Plume as being
approximately 300 feet away from the unnamed TCE plume, and the unnamed plume as being
approximately 150-175 feet from the Central TCE plume."  (State Counter., ¶ 12).

HDR figures[,]" (id. at 17) (emphasis in original); (4) "[a] south-southwesterly flow from the Frost Street [S]ites is toward the Bowling Green well field[,]" (id., ¶ 18); and (5) the SRI Memorandum "presents an east-west cross-section through the Bowling Green wells and shows PCE and TCE concentrations within the cross-section[,] . . . [and] indicates that the plume at the location of well TMW-7 may extend continuously downward and westward to the location of Bowling Green well #2."  (Id. ¶ 19(c)).

Moreover, the State relies upon, *inter alia*, the PDIE Report prepared by HDR in March 2010, (Christensen Decl., Ex. B), to dispute the Frost Street Defendants' contentions: (1) that "[t]he Eastern Plume 'contaminant concentrations drop off rapidly' below 150 feet bgs[,]" (FSD Add'l Facts, ¶ 8); (2) that the results of an investigation conducted by HDR in 2011 "demonstrated that the influence of the pumping of the Bowling Green wells on the three plumes was 'relatively minor,'" (id., ¶ 9); and (3) that the single sampling of a monitoring well installed between the Eastern Plume, the Central Plume and the Bowling Green wells, i.e., MW-15, at a single depth, which resulted in a "non-detect for PCE and TCE[] . . . confirms that the [E]astern [P]lume has not migrated west into the [C]entral [P]lume or Bowling Green wells." (Id., ¶ 10). The PDIE Report indicates, in relevant part:

> "Investigation data from one sample location (TMW [Temporary Monitoring Well]-7) was available within the [E]astern [P]lume. . . . The greatest concentration of PCE (11,000 ppb) was detected at 185 feet bgs.  A significant reduction in contaminant concentrations was recorded starting at and extending below a depth of 225 feet bgs.
>
> Based on the available analytical date, the [E]astern [P]lume appears to flow in a south-southwesterly direction for approximately 800 feet from FSMW [Frost Street Monitoring Well]-6B to TMW [Temporary Monitoring Well]-7.  Based on

groundwater elevation data collected from FSMW-14B and FSMW-14C there is a downward gradient within the [E]astern [P]lume resulting in migration of contaminants to greater depths as the plume moves through the study area. At the TMW-7 location, the greatest concentrations were detected at a depth of 185 to 205 feet bgs.

As the [E]astern [P]lume reaches the vicinity of TMW-7, the contamination reaches a depth and proximity where influences from the Bowling Green pumping wells begin to affect the groundwater flow direction. The contamination flow path likely shifts to a southwest direction in the vicinity of TMW-7. Although there are no monitoring points located south of TMW-7, impacts observed in TMW-8D[14] (located to the southwest of TMW-7) may be associated with the [E]astern [P]lume. The concentration of PCE detected in TMW-8D is greater compared to the concentration of TCE which is similar to the PCE/TCE ratio observed in the [E]astern [P]lume. The greatest concentration of PCE (680 ppb) detected in TMW-8D is greater than the greatest concentration of PCE (330 ppb in TMW-5) detected within the [C]entral [P]lume. The greatest concentrations of PCE at TMW-8D were observed at a depth of 337 and 357 feet bgs, approximately 150 feet deeper than the contamination detected at TMW-7 suggesting that the plume continues to migrate deeper as it progresses across the off-site study area.

* * * The [C]entral [P]lume is characterized by relatively high TCE concentration compared to PCE concentrations. 1,1,1-[TCA] was also detected within the [C]entral [P]lume wells. * * *

The [C]entral [P]lume appears to flow in a south-southwesterly direction for approximately 500 feet from Old Country Road towards well cluster MW-1 through MW-4. * * * Based on groundwater elevation data collected from MW-1 and MW-4 there is a downward gradient within the [C]entral [P]lume resulting in migration of contaminants to greater depths as the plume moves through the study area. * * *

As the [C]entral [P]lume reaches the vicinity of MW-1 through 4 and TMW-5, the contamination reaches a depth and proximity where influences from the Bowling Green pumping wells begin to affect the groundwater flow direction. The contamination flow path likely shifts to a southeast direction in the vicinity of TMW-5. * * *

In the previous section TMW-8D was linked to the [E]astern [P]lume, however TCE impacts observed in TWM-8D [sic] (located to the southeast of TMW-5)

_____

[14] TMW-8D is located within the Central Plume. (See Christensen Decl., Ex. B at 12).

> may also be associated with to [sic] the [C]entral [P]lume as well. TWM-8D [sic] is located closer to the [C]entral [P]lume area compared to the [E]astern [P]lume and the greatest concentration of TCE (360 ppb) was detected at a depth of 292 feet bgs which is consistent with data collected from MW-5. In addition, TCA which is a marker of the [C]entral [P]lume was detected in TMW-8D. The [C]entral and [E]astern [P]lumes may be comingling [sic] south of the pumping wells."

(Christensen Decl., Ex. B at 11-12).

Thus, there are genuine issues of material fact regarding, *inter alia*, the distinctiveness of the Eastern and Central Plumes and the harm caused by the Eastern Plume on the Bowling Green wells precluding summary judgment on the Frost Street Defendants' fifth affirmative defense of divisibility of harm.

### 2. Reasonable Basis for Apportionment

The Frost Street Defendants have also not satisfied their burden of establishing any reasonable basis for the apportionment of the State's response costs pertaining to its remedial investigation at the NCIA Sites and relating to State OU-3/EPA OU-1. Indeed, "apportionment itself is an intensely factual determination[,]" United States v. Alcan Aluminum ("Alcan I"), 990 F.2d 711, 722 (2d Cir. 1993); see also Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 170 n. 16 (2d Cir. 2002), and "differing contentions supported by expert affidavits raise sufficient questions of fact to preclude the granting of summary judgment on the divisibility issue." Alcan I, 990 F.2d at 722-23. Accordingly, the Frost Street Defendants' cross-motion for summary judgment on its fifth affirmative defense of divisibility of damages is denied. A bench trial on the issue of the divisibility of harm will be held before me on **April 11, 2016 at 10:00 a.m.**

C.      The State's Natural Resource Damages Claim

The State moves for summary judgment declaring "that, because [the Frost Street Defendants] are responsible parties under Section 107(a), [they] are jointly and severally liable to the State for natural resource damages, the amount of which will be determined at the conclusion of a natural resource damages assessment."  (State Mem. at 18).  The Frost Street Defendants move for partial summary judgment dismissing the State's NRD Claim on the grounds (1) that the State cannot "demonstrate that there is a loss of use of the purportedly damaged resource," (FSD NRD Mem. at 8), i.e., the groundwater aquifer in and around the NCIA; (2) that the NRD Claim is time-barred; and (3) that the State is not entitled to a rebuttable presumption under 42 U.S.C. § 9607(f)(2)(C) because it has not performed a natural resource damage assessment in accordance with the applicable regulations, 43 C.F.R. Part 11.  In addition, the Frost Street Defendants contend, for the first time in their reply brief, (1) that the State's NRD Claim is premature; and (2) that the State is not entitled to declaratory relief on its claim seeking to recover its costs of assessing natural resource damages.

1.      Frost Street Defendants' Motion

a.      Timing of NRD Claims

Contrary to the Frost Street Defendants' contentions, the State's NRD claim is neither time-barred, nor premature.

i.       Statute of Limitations

Section 113(g)(1)of CERCLA provides, in relevant part, that with exceptions not relevant here,

> "no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following: (A) The date of the discovery of the loss and its connection with the release in question.  (B) The date on which regulations are promulgated under section 9651(c) of this title.
>
> With respect to any facility listed on the National Priorities List (NPL), . . . an action for damages under this chapter must be commenced *within 3 years after the completion of the remedial action* (excluding operation and maintenance activities) *in lieu of the dates referred to in subparagraph (A) or (B). . . .*"

42 U.S.C. § 9613(g)(1) (emphasis added).  Since it is undisputed that State OU-3/EPA OU-1 was listed on the National Priorities List ("NPL") in 2011, and the EPA has not yet implemented, must less completed, the remedial action selected for that site in the EPA ROD, the State's NRD Claim is clearly timely under Section 113(g)(1) of CERCLA.

The Frost Street Defendants' contention that the listing of State OU-3/EPA OU-1 on the NPL in 2011, approximately five (5) years after the State commenced this action and sixteen (16) years after the State discovered the contamination, did not revive the State's NRD Claim, which was already time-barred under Section 113(g)(1)(A) of CERCLA, is without merit.  In rejecting essentially the same argument, Judge Lodge in the United States District Court for the District of Idaho, held as follows:

> "In applying a plain reading of the statute, the Court finds that there is an open-ended statute of limitations for any facility listed on the NPL. The Court can determine no statutory or regulatory time limit on how long (after the discovery of the loss to the natural resource and its connection to a release) the EPA has to

determine that a site should be listed on the NPL. If the trustee fails to file a NRD action within 3 years of the date of the discovery of the loss and its connection with the release in question under 42 U.S.C. § 9613(g)(A) [sic], then the trustee can still timely file a NRD action for the loss if the facility is listed by the EPA on the NPL . . . .

. . . [T]his interpretation is consistent with the requirement to construe the statute in favor of the government and consistent with the legislative purpose of the statute. CERCLA was enacted to clean up hazardous substances which may endanger public health or environment and to hold those responsible for releases liable for the damage. The open-ended statute of limitations is consistent with the nature and number of potential NPL sites. The nature of a NPL site is that they require long-term investigation. The EPA could never be adequately staffed to determine all NPL sites within three years of the discovery of a loss and its connection with a hazardous substance release. The EPA needs time to evaluate sites, determine if they should be listed on the NPL and complete the remedial action before a statute of limitations should expire. Moreover, because NPL sites involve the risk of danger to human health and/or the environment, the EPA will list NPL sites as soon as possible in order to reduce or eliminate the risks such a site poses. Therefore, it would not be in the public's interest to delay listing a site on the NPL any longer than necessary to complete the investigation of the site. Moreover, for the same health and safety reasons, the site may be listed before the connection to a particular release is determined in order to protect the public and the environment. For these reasons, the Court finds that the resulting open-ended statute of limitations for facilities listed on the NPL is not an absurd result."

U.S. v. ASARCO Inc., 28 F. Supp. 2d 1170, 1179-80 (D. Idaho,1998), vacated on other grounds, 214 F.3d 1104 (9th Cir. 2000); see also 2 Superfund & Brownfields Cleanup § 24:4 ("For. . . facilities[] . . . listed on the National Priorities List (NPL), . . . the statute of limitations does not run until three years after the remedial action has been completed.[]  This means that, though a defendant may have satisfied the tests of both subparagraphs (A) and (B) and may otherwise have a valid statute of limitations defense, the government can, after the limitations period has expired, take that defense away by unilateral administrative action. . . . [O]nce the three-year limitations period has been rendered inapplicable, it is replaced with a limitations period of

virtually unlimited duration because it does not begin to run until EPA has completed its remedial action."); Vicky L. Peters, Has the 'Sleeping Giant' Been Caught Napping? (Statute of Limitations for Natural Resource Damage Claims under CERCLA), 15 No. 6 Nat'l Ass'n of Att'ys Gen.: Nat'l Envtl. Enforcement J. 3 (July, 2000) (indicating that claims that are not brought within the timeframe of Sections 113(g)(1)(A) and (B) of CERCLA "may be resurrected if the site is subsequently listed on the NPL. . . .")

I find Judge Lodge's reasoning persuasive and, thus, similarly hold that upon a plain reading of Section 113(g)(1) of CERCLA, with respect to, *inter alia*, any facility listed on the NPL, a natural resource damages claim is timely so long as it is commenced within three (3) years after the completion of the remedial action, notwithstanding that such claim would have been untimely under Sections 113(g)(1)(A) and (B) of CERCLA at the time the facility was listed on the NPL.  Indeed, the statutory language expressly provides that with respect to, *inter alia*, any facility listed on the NPL, a claim for natural resource damages "must be commenced within 3 years after the completion of the remedial action . . . *in lieu of* the dates referred to in subparagraph (A) or (B)."  42 U.S.C. § 9613(g)(1) (emphasis added).  Since the phrase "in lieu of" commonly means "[i]nstead of or in place of[,]" In lieu of, Black's Law Dictionary (10th ed. 2014), it is clear that once a facility is listed on the NPL, only the "3 years after the completion of the remedial action" limitations period applies.  Accordingly, the branch of the Frost Street Defendants' motion seeking partial summary judgment dismissing the State's NRD Claim as time-barred is denied.

ii.     Ripeness

In their reply, the Frost Street Defendants seemingly abandon their statute of limitations

defense in favor of an argument that the State's NRD Claim is premature because the amount of

damages cannot be measured until the EPA completes its remedial work in approximately thirty

(30) years.

However, Section 113(g)(1) of CERCLA provides express time limits for when a natural

resource damages claim may be asserted.  That section provides, in relevant part, as follows:

> "In no event may an action for damages under this chapter with respect to such a
> vessel or facility be commenced (i) prior to 60 days after the Federal or State
> natural resource trustee provides to the President and the potentially responsible
> party a notice of intent to file suit, or (ii) before selection of the remedial action if
> the President is diligently proceeding with a remedial investigation and feasibility
> study under section 9604(b) of this title or section 9620 of this title (relating to
> Federal facilities)."

42 U.S.C. § 9613(g)(1).  Since, *inter alia*, it is undisputed that the EPA has selected the remedial

action for State OU-3/EPA OU-1, there is no statutory bar to the State's NRD claim at this stage.

Moreover, for the reasons set forth below, there is an identifiable injury, i.e.,

contaminants in groundwater at concentrations exceeding the State's drinking water standards.

Accordingly, the State's claim seeking a declaratory judgment on the issue of the Frost Street

Defendants' liability for natural resource damages is ripe for adjudication.  Indeed, Section

113(g) of CERCLA provides, in pertinent part,

> "In any such action described in this subsection, the court shall enter a declaratory
> judgment on liability for response costs *or damages* that will be binding on any
> subsequent action or actions to recover further response costs or damages. A
> subsequent action or actions under section 9607 of this title for further response
> costs at the vessel or facility may be maintained at any time during the response

action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred."

42 U.S.C. § 9613(g) (emphasis added). Pursuant to that statute, "[t]he entry of declaratory judgment as to liability is mandatory. The fact that future costs are somewhat speculative is no bar to a present declaration of liability." New York v. Green, 420 F.3d 99, 111 (2d Cir. 2005) (quotations and citation omitted); accord New York v. Adamowicz ("Adamowicz II"), 16 F. Supp. 3d 123, 143 (E.D.N.Y. 2014), aff'd, 609 F. App'x 19 (2d Cir. Apr. 23, 2015).[15]

Furthermore, unlike an action seeking to recover response costs, which may not be commenced until "after such costs have been incurred," 42 U.S.C. § 9613(g), "there is no requirement that money must be expended by the state before it can seek to recover for damages to natural resources." State of New York v. General Elec. Co., 592 F. Supp. 291, 298 (N.D.N.Y. 1984); accord Asarco, 280 F. Supp. 2d at 1102, n. 6. Accordingly, the branch of the Frost Street Defendants' motion seeking partial summary judgment dismissing the State's NRD Claim as premature is denied.


b.      Assessment Costs

Section 107(a)(4)(C) of CERCLA provides that responsible parties are liable for, *inter*

---

[15] In the event the State commences an action to recover its natural resources damages following a natural resource damages assessment, (see State Mem. at 18), the Frost Street Defendants "will be entitled at that time to raise any appropriate objections to the amount of the State's [damages] . . . though [they] will not be entitled to litigate their liability for such [damages]." Green, 420 F.3d 99, 111 (2d Cir. 2005).

*alia*, "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release[.]"  42 U.S.C. § 9607(a)(4)(C).  In <u>Confederated Tribes & Bands of the Yakama Nation v. United States</u>, 616 F. Supp. 2d 1094 (E.D. Wash. 2007), upon which the Frost Street Defendants rely, the district court held, in relevant part, as follows:

> "Despite the fact that injury assessment costs are included in 42 U.S.C. § 9607(a)(4)(C) along with natural resource damages, this court concludes there is a clear common sense distinction between the two. Simply put, 'costs' are intended to reimburse a party for certain expenses incurred by it, whereas 'damages' are intended to compensate a party for an injury or a loss. In the context of § 9607(a)(4)(C), this means that injury assessment costs reimburse a party for costs incurred in determining the extent of an injury (a damages assessment), whereas damages compensate for the injury (the loss) itself in order to make the party whole. This plain meaning is evident from the plain language of § 9607(a)(4)(C), as well as the plain language of (a)(4)(A), (B), (C), and (D), all of which refer to categories of costs.

> While 42 U.S.C. § 9601 contains a definition of 'damages,' it does not contain a definition of 'costs.' § 9601(6) states that the term 'damages' means 'damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title.' This definition, however, does not suggest in the slightest that the injury assessment costs referred to in § 9607(a)(4)(C) constitute a component of the 'damages' referred to in that provision. Indeed, § 9611(b), makes clear the obvious distinction between 'costs' and 'damages.' It authorizes assertion of certain claims against the Hazardous Substance Superfund including those 'for injury to, or destruction or loss of, natural resources, including costs for damage assessment.' § 9611(b)(1). Among those authorized to assert such claims are States and Indian tribes. § 9611(b)(2)(A) provides that '[n]o natural resource claims may be paid from the Fund unless the President determines that the claimant has exhausted all administrative and judicial remedies to recover the amount of such claim from persons who may be liable under section 9607 of this title.' § 9611(b)(2)(B) defines 'natural resource claim' as 'any claim for injury to, or destruction of, or loss of, natural resources' and specifies that '[t]he term does not include any claim for the costs of natural resource damage assessment.'"

<u>Id.</u> at 1097-98.

However, I find the district court's reasoning in <u>Confederated Tribes</u> to be unpersuasive. Under the plain language of Section 107(a)(4)(C) of CERCLA, under which the State asserts its NRD claim, natural resource damages expressly "includ[e] the reasonable costs of assessing such injury, destruction, or loss resulting from such a release[.]" 42 U.S.C. § 9607(a)(4)(C).  Since the term "include" means "[t]o contain as a part of something[,]" Include, <u>Black's Law Dictionary</u> (10th ed. 2014), for claims seeking natural resource damages under Section 107(a)(4)(C) of CERCLA, the reasonable costs of assessing the injury to natural resources are contained as part of the natural resource damages.

Although, as noted by the district court in <u>Confederated Tribes</u>, Section 111(b)(2)(B) of CERCLA specifically excludes "any claim for the costs of natural resource damage assessment[]" from the term "natural resource claim," by its terms, that definition of "natural resource claim" is limited to paragraph two (2) of subsection (b) of Section 111 of CERCLA. Specifically, Section 111(b)(2) of CERCLA provides, in relevant part:

> "(A) . . . No natural resource claim may be paid from the [Hazardous Substance Superfund] unless the President determines that the claimant has exhausted all administrative and judicial remedies to recover the amount of such claim from persons who may be liable under section 9607 of this title.  (B) . . . *As used in this paragraph*, the term 'natural resource claim' means any claim for injury to, or destruction or loss of, natural resources.  The term does not include any claim for the costs of natural resource damage assessment."

42 U.S.C. § 9611(b)(2) (emphasis added).  As the State is not asserting a natural resource claim against the Hazardous Substance Superfund pursuant to Section 111 of CERCLA, that section is inapplicable to its NRD claim against the Frost Street Defendants pursuant to Section 107(a)(4)(C) of CERCLA.

Moreover, under the principle that *expressio unius est exclusio alterius*, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300, 78 L. Ed. 2d 17 (1983); see also Dep't of Homeland Sec. v. MacLean, 135 S. Ct. 913, 919, 190 L. Ed. 2d 771 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.") Had Congress intended to exclude assessment costs from natural resource damages sought pursuant to Section 107(a)(4)(C) of CERCLA, it presumably would have expressly done so as it did for natural resource claims asserted pursuant to Section 111(b)(2) of CERCLA. Instead, Congress explicitly included reasonable injury assessment costs as a part of natural resource damages sought pursuant to Section 107(a)(4)(C) of CERCLA. Accordingly, to the extent the Frost Street Defendants seek partial summary judgment dismissing the State's claim seeking judgment declaring that the Frost Street Defendants are liable for reasonable injury assessment costs, that branch of the Frost Street Defendants' motion is denied.

c.    CERCLA's Rebuttable Presumption

In accordance with § 301(c) of CERCLA, the United States Department of the Interior ("DOI") promulgated regulations for the assessment of natural resource damages resulting from hazardous substance releases in Part 11, Subpart A, Title 43 of the Code of Federal Regulations

("the DOI regulations"). Although the assessment procedures provided therein are not

mandatory, see 43 C.F.R. § 11.10, "they must be used by Federal or State natural resource

trustees in order to obtain the rebuttable presumption contained in section 107(f)(2)(C) of

CERCLA." 43 C.F.R. § 11.10; see also 43 C.F.R. § 11.11 ("The results of an assessment

performed by a Federal or State natural resource trustee according to these procedures shall be

accorded the evidentiary status of a rebuttable presumption as provided in section 107(f)(2)(C) of

CERCLA."); Natural Resource Damages for Hazardous Substances, 73 Fed. Reg. 57,259, 57,260

(Oct. 2, 2008) ("If litigation is necessary to resolve the claim [for natural resource damages],

courts will give additional deference– referred to as a 'rebuttable presumption' in CERCLA– to

assessments performed by federal and state trustees in accord with the regulations.") Section

107(f)(2)(C) of CERCLA provides, in relevant part, that "[a]ny determination or assessment of

damages to natural resources for the purposes of this chapter . . . made by a Federal or State

trustee in accordance with the regulations promulgated under section 9651(c) of this title shall

have the force and effect of a rebuttable presumption on behalf of the trustee in any

administrative or judicial proceeding [there]under . . . ." 42 U.S.C. § 9607(f)(2)(C).

Since the State admittedly has not performed a natural resource damage assessment in

accordance with the DOI regulations, the Frost Street Defendants are correct that it is not entitled

to CERCLA's rebuttable presumption on this motion. However, where, as here, the relevant

facts with respect to liability for natural resource damages are largely undisputed, as set forth

below, the absence of the rebuttable presumption neither requires dismissal of the State's NRD

Claim, nor precludes granting summary judgment in favor of the State on its claim seeking judgment declaring that the Frost Street Defendants are liable for natural resource damages.

> ## 2. The State's Motion

In order to establish that a defendant is liable for natural resource damages under CERCLA, the State must establish (1) that the property owned and operated by the defendant is a "facility;" (2) that "a 'release' or threatened release' of a 'hazardous substance' from the facility has occurred,"[16] Coeur D'Alene Tribe v. Asarco Inc., 280 F. Supp. 2d 1094, 1102 (D. Idaho 2003), modified on other grounds by United States v. Asarco Inc., 471 F. Supp. 2d 1063, 1067-68 (D. Idaho 2005); (3) that the defendants are "responsible parties" within the meaning of 42 U.S.C. § 9607(a); (4) that "natural resources[] within the trusteeship of the [State] have been injured[,]" id.; and (5) "that the injury to natural resources 'resulted from' a release of a hazardous substance." Id. at 1102-03. For the reasons set forth above, the State has established the first three (3) elements as a matter of law.

CERCLA defines the term "natural resources" broadly to include "land, fish, wildlife, biota, air, water, *ground water*, *drinking water supplies*, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States . . . , any State or local government, . . . ." 42 U.S.C. § 9601(16) (emphasis added); see also 43 C.F.R. § 11.14(z); City of New York v. Exxon Corp. ("Exxon II"), 766 F. Supp. 177, 196 (S.D.N.Y.

---

[16] Pursuant to applicable regulations, the term "release" "means a release of a hazardous substance as defined in section 101(22) of CERCLA." 43 C.F.R. § 11.14(hh).

1991).  Pursuant to the DOI regulations, "natural resources have been categorized into the

following five groups: Surface water resources, ground water resources, air resources, geologic

resources, and biological resources."  43 C.F.R. § 11.14(z).  Underground aquifers under the

control or management of the State or local government "are natural resources within the

meaning of the statute, and damage to them may be compensated by an action under CERCLA."

City of New York v. Exxon Corp. ("Exxon I"), 633 F. Supp. 609, 618 (S.D.N.Y. 1986); see also

Artesian Water, 659 F. Supp. at 1288.

      The DOI regulations define the terms: (1) "damages" to mean "the amount of money

sought by the natural resource trustee[17] as compensation for injury, destruction, or loss of

natural resources as set forth in section 107(a) or 111(b) of CERCLA[,]" 43 C.F.R. § 11.14(*l*);

(2) "injury" to mean "a measurable adverse change, either long- or short-term, in the chemical or

physical quality or the viability of a natural resource resulting either directly or indirectly from

exposure to a . . . release of a hazardous substance, or exposure to a product of reactions resulting

from the . . . release of a hazardous substance," id., § 11.14(v)[18]; (3) "destruction" to mean "the

---

[17]  The DOI regulations define "trustee," in relevant part, to mean "any State agency
designated by the Governor of each State, pursuant to section 107(f)(2)(B) of CERCLA, that may
prosecute claims for damages under section 107(f) . . . of CERCLA."  43 C.F.R. § 11.14(rr).

[18]  The Frost Street Defendants apparently conflate the term "injury" with the term
"damages."  However, as indicated by the Secretary of the DOI in the preamble to the final rule
on natural resource damage assessments ("the preamble"):

      "The definition of injury adopted in this rule is fundamental to the assessment
      process.  Without injury to one or more natural resources there is no damage to
      recover.  A general definition of injury is provided in § 11.14(v).  The rule clearly
      distinguishes between the concepts of 'damage' and 'injury.'  Following the
      statutory division in use of the words, 'damage' is the amount of money sought in

total and irreversible loss of a natural resource," id., § 11.14(m); and (4) "loss" to mean "a measurable adverse reduction of a chemical or physical quality or viability of a natural resource[,]" id., § 11.14(x). Thus, contrary to the Frost Street Defendants' contention, natural resource damages are not limited to a loss of use, either temporary or permanent, of a natural resource.[19]

---

compensation for an 'injury.' Injury is the 'injury to,' 'destruction of,' or 'loss of' the resource.

The injury definition has two parts. First, there must be a measurable adverse change in the resource. That is, there must be a change for the worse, in the resource that is detectable by observation or scientific methods. Specific definitions of injury are provided for each resource in § 11.62. The criteria for what constitutes a measurable injury are strict. . . . By establishing acceptance criteria for the measurement methodologies for the injuries to the resources, the rule requires that the authorized official use only quality evidence in measuring the adverse change in a resource.

Second, the adverse change must be to the chemical or physical quality . . . of a resource. . . . Water and air, for instance, are commonly evaluated in terms of established water quality or air quality standards. . . .

Finally, to be compensable under CERCLA . . . , the injury must result from a . . . release of a hazardous substance, or from a product of reactions resulting from the . . . release of a hazardous substance. This result is established by the demonstration of a link between the . . . release and the injured resources, called the pathway determination as provided in § 11.63."

Natural Resource Damage Assessments, 51 Fed. Reg. 27,674, 27,682-83 (Aug. 1, 1986).

[19] Indeed, the case New Mexico v. Gen. Elec. Co., 467 F.3d 1223 (10th Cir. 2006), upon which the Frost Street Defendants rely, is inapposite. In affirming the district court's entry of summary judgment in favor of the defendants on the State's claim for damages under New Mexico law pursuant to a "loss-of-use damage theory," the United States Court of Appeal for the Tenth Circuit held, in relevant part, that "[i]f a contaminated natural resource such as groundwater can be replaced in a timely manner pending restoration, [it] ha[d] difficulty envisioning any significant loss-of-use damage." Id. at 1250-52. The Court did not hold that the State was limited to seeking damages under CERCLA for loss of use of a natural resource; only

"The fact that hazardous substances of the type generated by [the defendants] have contaminated soil, groundwater and surface waters at and near the [site] is sufficient ground to impose liability for natural resources [up]on [them]." Exxon II, 766 F. Supp. at 196; see also Coeur D'Alene Tribe, 280 F. Supp. 2d at 1106, 1123-24 (finding injury to natural resources where, *inter alia*, the hazardous substances at issue were present in the surface water, ground water and soils at the site). Indeed, the DOI regulations provide, in relevant part:

> "The authorized official shall determine that an injury has occurred to natural resources based upon the definitions provided in this section for surface water, ground water, air, geologic, and biological resources. The authorized official shall test for injury using the methodologies and guidance provided in § 11.64 of this part. The test results of the methodologies must meet the acceptance criteria provided in this section to make a determination of injury."

43 C.F.R. § 11.62(a). For ground water resources, the DOI regulations indicate, in relevant part, that "[a]n injury to a ground water resource has resulted from the . . . release of a hazardous substance if one or more of the following changes in the physical or chemical quality of the resource is measured: (i) Concentrations of substances in excess of drinking water standards, established by . . . Federal or State laws or regulations that establish such standards for drinking water, in ground water that was potable before the . . . release[] . . . ." 43 C.F.R. § 11.62(c)(1). Since, *inter alia*, it is undisputed that the measurement of concentrations of VOCs, including PCE, in groundwater samples collected from the NCIA and State OU-3/EPA OU-1 exceeded state drinking water standards, the State has established that an injury to a natural resource, i.e.,

---

that the State could not establish its claim under state law for damages under the specific "loss of use" theory asserted by the State.

the groundwater at the NCIA and State OU-3/EPA OU-1, has resulted from the Frost Street Defendants' release of hazardous substances. Accordingly, the Frost Street Defendants are liable for damages sought by the State as compensation for the injury to the groundwater at the NCIA and State OU-3/EPA OU-1.

However, for the reasons set forth above, there are triable issues of fact with respect to the Frost Street Defendants' affirmative defense of divisibility of harm. Accordingly, the branch of the State's motion pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking summary judgment on the issue of the Frost Street Defendants' liability for natural resource damages under Sections 107(a)(4)(C) and 113(g)(2) of CERCLA is granted only to the extent that the State is awarded judgment declaring that the Frost Street Defendants are liable for natural resource damages sought by the State as compensation for the injury to the groundwater at the NCIA and State OU-3/EPA OU-1, including the reasonable costs of assessing such injury[20], and

---

[20] However, Section 107(f)(1) of CERCLA expressly precludes the State from obtaining a "double recovery" for natural resource damages by providing, in relevant part:

> "Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) of this section shall not be limited by the sums which can be used to restore or replace such resources. There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource."

42 U.S.C. § 9607(f)(1); see also 43 C.F.R. § 11.15(d) ("There shall be no double recovery under this rule for damages or for assessment costs, that is, damages or assessment costs may only be recovered once, for the same . . . release and natural resource, as set forth in section 107(f)(1) of CERCLA.")

that branch of the motion is otherwise denied.  As noted above, a bench trial on, *inter alia*, the

Frost Street Defendants's fifth affirmative defense of divisibility of damages will be held on

**April 11, 2016 at 10:00 a.m.**[21]

III.    CONCLUSION

For the reasons set forth above, (1) the Frost Street Defendants' motion pursuant to Rule

56 of the Federal Rules of Civil Procedure for partial summary judgment dismissing the State's

claim for natural resource damages is denied; (2) the State's motion for partial summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted to the extent that

the State is awarded judgment declaring (a) that the State's past response actions with respect to

the NCIA are not inconsistent with the National Contingency Plan under Section 107(a) of

CERCLA, 42 U.S.C. § 9607(a), and (b) that the Frost Street Defendants are liable (i) under

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs incurred by the State in

responding to contamination at and emanating from the NCIA, and specifically into the off-site

area referred to herein as State OU-3/EPA OU-1; and (ii) for natural resource damages sought as

compensation for the injury to the groundwater at the NCIA and State OU-3/EPA OU-1,

---

[21]  However, this Court is not required to keep this case open for an indefinite or extended period of time while the State conducts a natural resource damages assessment.  Indeed, Section 113(g) of CERCLA specifically contemplates that after the entry of a declaratory judgment on liability for damages, a "subsequent action" will be commenced "to recover further response costs or damages."  42 U.S.C. § 9613(g).  Accordingly, following a determination of the Frost Street Defendant's divisibility of harm defense, the State's NRD claim will be dismissed without prejudice to commencing a subsequent action following a natural resource damages assessment, or other determination of the amount of damages, if any, the State may recover from the Frost Street Defendants as compensation for the injury to the groundwater at the NCIA and State OU-3/EPA OU-1.

including the reasonable costs of assessing such injury, pursuant to Sections 107(a) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g)(2), and the State's motion is otherwise denied; and (3) the Frost Street Defendants' cross motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on their fifth affirmative defense for divisibility of harm is denied. A bench trial on the Frost Street Defendants' fifth affirmative defense for divisibility of harm, and on the State's claims against 101 Frost Street Corp. and the Estate of Emily Spiegel, will be held before me **on April 11, 2016 at 10:00 a.m.** in Courtroom 1010 at the Central Islip Courthouse, located at 100 Federal Plaza, Central Islip, New York 11722.

SO ORDERED.

_____
/s/
Sandra J. Feuerstein
United States District Judge

Dated: February 9, 2016
      Central Islip, New York